SOHIO CORPORATION, A DELAWARE CORPORATION, AND SOHIO PETROLEUM COMPANY, AN OHIO CORPORATION, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7192. Promulgated July 31, 1946.

*M. E. Newcomer, Esq.*, for the petitioners.
*M. W. Kerr, Esq.*, for the respondent.

### OPINION.

BLACK, *Judge*: This case involves income tax for the year 1941 and excess profits tax liability for the year 1942. Deficiencies were determined in the respective amounts of $919.69 and $23,954.40. Several items entering into such deficiencies have been disposed of by stipulation and will be reflected in decision under Rule 50. This leaves for consideration only the question as to whether there should be included in petitioner's gross income in each of the taxable years certain amounts retained by the petitioner as compensation for the collection and payment to the State of Illinois of a tax levied on oil purchased by the petitioner. The petitioner was required by law to retain the compensation out of a tax which it was required to deduct from the

purchase price of oil. The petitioner protested the tax and it was later held unconstitutional; after which the petitioner refunded to its vendors of oil the amounts so retained.

The facts are found as stipulated. The following summary of the facts will suffice for the purpose of decision of the only issue presented.

Petitioner Sohio Corporation was a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at Cleveland, Ohio. Petitioner Sohio Petroleum Co. is the successor by merger of petitioner Sohio Corporation. Such merger became effective as of January 1, 1944. The Sohio Corporation, which was the taxpayer in connection with the transactions involved herein, is referred to as the petitioner. The corporation income and excess profits tax returns for the taxable years were filed with the collector for the eighteenth district of Ohio, at Cleveland, Ohio.

The pertinent facts are that in 1941 and 1942 petitioner was purchasing oil in large quantities from various oil producers in Illinois; that the Assembly of the State of Illinois passed a law, effective on July 1, 1941, requiring the petitioner, among others, to retain from the amounts owing to its vendors of oil a tax of 3 per cent of the value of the oil, and to remit it to the State of Illinois, deducting reasonable compensation, subject to the approval of the state, for such collection and payment of the tax, the expense not to exceed 2 per cent of the amount of the tax so retained from vendors of oil and remitted to the state. The act imposed heavy penalties for failure to comply therewith. The petitioner was required to keep records, make monthly returns, secure a revocable registration certificate in order to receive oil, and retain and remit the tax on oil. Failure to comply with such provision subjected the corporate officers to criminal penalties, and failure to make the monthly return and pay the tax to the Department of Finance of Illinois subjected the petitioner to liability of cancellation of certificate and a penalty of 50 per cent of the tax due, and interest of 1 per cent per month. In addition, injunction could be applied for by the state to prevent the petitioner from purchasing oil in Illinois if the act or the regulations were violated. The petitioner retained such tax from the amounts due its vendors and remitted it, under protest, to the state treasurer, through the taxable years after passage of the act, retaining 2 per cent of the amount collected as its expenses. The 2 per cent amounted to $15,701.95 in 1941 and $23,151.02 in 1942. It was not set aside in any escrow or trust fund, but was commingled with petitioner's common income from all sources.

Shortly after the effective date of the act of the Illinois Assembly, and upon September 17, 1941, petitioner filed action in court, as did others, seeking to have the act of the assembly declared invalid as

unconstitutional, and to restrain the state treasurer from transferring the funds collected into the general revenue fund of the state. The petitioner's complaint alleged, *inter alia*, that it had become obligated by the act to collect the tax, had done so, had retained 2 per cent thereof to compensate it for the cost of collecting and remitting, and had paid the remainder under protest, to the state, to prevent the imposition of the penalties provided by the act for failure to collect the tax and pay to the state. Reciting the penalties provided by the act, the complaint alleged that petitioner was threatened with loss of its business in Illinois should it have failed to pay the tax as provided, and that it intended to collect the tax and pay it to the state, under protest, so long as it was threatened with the penalties of the act for failure to do so.

Promptly after filing the action to have the law declared invalid, the petitioner gave notice, in writing, of the filing of the action to those from whom it was collecting the oil production tax, stating that the suit was filed to protect their interests as well as petitioner's and that it was petitioner's opinion that the law would be declared unconstitutional and the taxes would be refunded.

On March 21, 1944, the Supreme Court of Illinois, in *Ohio Oil Co.* v. *Wright*, 386 Ill. 206; 53 N. E. (2d) 966, declared the whole act invalid for unconstitutionality, and in pursuance of its mandate the Circuit Court of Sangamon County, in which petitioner had filed its case, directed the state treasurer to refund the entire amount of the production taxes collected by petitioner and remitted to him by the petitioner, upon condition that petitioner distribute the full amount thereof to the parties from whom it was collected. Accordingly, the state treasurer refunded the entire amount received by him from petitioner, and the petitioner returned the moneys, together with the 2 per cent it had retained as compensation for collection and remittance, to the parties from whom it had been retained. In accordance with the decree of the Circuit Court, the petitioner on July 7, 1945, filed a report with that court. It reported distribution made by it of all moneys retained from those from whom it purchased oil, including the 2 per cent retained for services.

In the computation of its income and excess profits tax liabilities, the petitioner deducted the actual expenses incurred in connection with the collection of the Illinois oil production tax and remittance thereof to the Finance Department of Illinois, and such deductions were allowed. These deductions are not separately designated. Petitioner included the $15,701.95 and $23,151.02 in its gross income, but upon receipt of the deficiency notice it, by letter, requested the Commissioner to correct and adjust the deficiency to eliminate such amounts from income. This request the Commissioner denied, and he included the

amounts in gross income. The petition here alleges that petitioner erred in including the amounts in income and that the Commissioner erred in refusing to reduce the reported income accordingly.

The petitioner's argument is, in effect, that it never had a right to any of the funds involved and never asserted any such right, but at all times denied such right; that in retaining the 2 per cent it acted only under threat of heavy penalties for violation of the Illinois statute; and that later in 1944 it repaid the money, so that its gross income should not be held to include it. The respondent in substance argues that in the computation of petitioner's income and excess profits tax liabilities for the years 1941 and 1942 the petitioner properly included the $15,701.95 and $23,151.02, respectively, as part of its gross income and the actual expenses incurred by the petitioner in connection with the collection of the Illinois production tax and remittance of the same to the treasurer of the State of Illinois were reflected as expense deductions in said returns and said deductions were properly allowed by the respondent in the computation of the deficiencies here involved. "In other words," says respondent, "although the petitioner protested the constitutionality of the tax in question, in all other respects the income was unquestionably treated as though it was received under a claim of right." In support of his contentions respondent cites *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417; *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359; *Blum* v. *Helvering*, 74 Fed. (2d) 482; *D. H. Byrd*, 32 B. T. A. 568; *S. B. Heininger*, 47 B. T. A. 95; and *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281. We think respondent must be sustained. In the first place, the Illinois statutes did not require petitioner to retain 2 per cent of the amount which it collected to compensate it for the expenses incurred in collecting and remitting to the state the production taxes. The statute permitted the petitioner to deduct for such purposes *not more* than 2 per cent. The statute itself provides as follows:

Each manager and each receiver who is required to collect the tax from any producer shall determine the actual cost of making such collection and payment to the Department and shall, subject to the approval of the Department, deduct such cost, not to exceed two (2%) per cent of the amount so collected, from the amount of his tax return.

Presumably petitioner, in making its rendition to the State of Illinois, estimated that the cost of collecting and remitting the tax was approximately the 2 per cent allowed by the statute. Whatever the actual cost to petitioner was for doing this service for the State of Illinois it was deducted as expenses for each of the taxable years, and these expenses were allowed by the Commissioner. On this point it has been stipulated:

In the computation of petitioner's income and excess profits tax liabilities for the years 1941 and 1942, the actual expenses incurred by the petitioner in connection with the collection of the Illinois Oil Production Tax and remittance of the same to the Treasurer of the State of Illinois were reflected as expense deductions in said returns, and said deductions were allowed by the respondent in the computation of the deficiencies in controversy herein for the said years 1941 and 1942.

This being so, it seems to us petitioner was required to return as gross income the $15,701.95 and $23,151.02 which it retained to reimburse it for these expenses. Otherwise, petitioner would have been receiving deductions for expenses for which in the same year it was being reimbursed by another, and that is not permissible under our income tax laws. It is of course true that, if petitioner had known in each of the taxable years that it would have to return later to the oil-producing companies the 2 per cent which it was retaining, then doubtless it could have accrued, as an offset to the amounts in question, liabilities to its customers to make restitution of like amounts in future years. It had no such knowledge in either of the taxable years. While it believed in good faith that the taxing act was unconstitutional, it did not know that to be true. Clearly, it intended to make refund of the 2 per cent retained to the oil producers only *if and when* the act was declared unconstitutional. If the Supreme Court of Illinois had declared the act to be constitutional, there is no reason to suppose that petitioner would have ever returned the 2 per cent in question to the oil producers. It would have been under no obligation to do so, either legally or morally.

We think that under the facts we have here the case is controlled by the Supreme Court's decision in *Security Flour Mills Co.* v. *Commissioner, supra.* The substance of the Court's holding in that case was that the Commissioner and the Tax Court are not authorized to make exceptions to a general rule of accounting by annual periods upon finding that it would be unjust or unfair not to isolate particular transactions and treat them on a basis of long term result. In the *Security Flour Mills Co.* case the taxpayer set up on its books a suspense account which it termed "Reserve for processing tax, claims, etc." The taxpayer refunded various sums to its customers, totaling over $45,000 in 1936, 1937, and 1938, to reimburse customers for processing tax included in the price of flour sold them in 1935 and not paid to the collector of internal revenue as processing taxes. In its 1935 tax return the taxpayer deducted from gross income, as accrued tax liability, the total of the amounts impounded and accrued but not paid the collector in the year 1935. The Commissioner found a deficiency upon disallowing the petitioner's deduction for taxes accrued but not paid in 1935. In its appeal to the Board the taxpayer assigned as its first allegation of error the failure of the Commissioner to allow as

a deduction in 1935 the $45,865.90 which the taxpayer had refunded to its customers in 1936, 1937, and 1938. Petitioner argued that it was necessary to do this in order to correctly reflect its income. We sustained petitioner on authority of *Cannon Valley Milling Co.*, 44 B. T. A. 763. See *Security Flour Mills Co.*, 45 B. T. A. 671. We were reversed by the Tenth Circuit, see *Commissioner* v. *Security Flour Mills Co.*, 135 Fed. (2d) 165, and the Supreme Court granted certiorari and affirmed the Tenth Circuit and reversed the Board. In its opinion the Supreme Court, among other things, said:

* * * As it admittedly received the money in question in 1935 and could not deduct from gross income an accrued liability to offset it, the receipt, it would seem, must constitute income for that year.

In the instant case the petitioner in each of the taxable years retained, out of the price due its customers for oil purchased from them, the 3 per cent tax due the State of Illinois. Of the amount thus retained, petitioner paid over to the state treasurer 98 per cent thereof. As to this latter amount there is no controversy. But, as we have already pointed out, petitioner had retained and commingled with its own funds the other 2 per cent, and unless it is entitled to accrue against this amount the refunds which it subsequently made to its customers in 1944, it is taxable on the 2 per cent retained in 1941 and 1942, under the language of the Supreme Court's opinion in the *Security Flour Mills Co.* case, *supra*. We think petitioner could not properly accrue on its books in 1941 as an offset against the $15,701.95 which it retained that year an equivalent amount which it actually refunded to its customers in 1944. The same is true of the $23,151.02 collected and retained by petitioner in 1942. The principles of the *Security Flour Mills Co.* case forbid such an offset accrual. There would be no more reason to allow petitioner such an accrual in the taxable years which we have before us than there was to allow the taxpayer in the *Security Flour Mills Co.* case the benefit of such a deduction of the $45,865.90 in 1935 for amounts which it refunded to customers in 1936, 1937, and 1938. The Supreme Court, in the *Security Flour Mills Co.* case, refused to permit such an adjustment.

In *Brown* v. *Helvering*, 291 U. S. 193, the Supreme Court laid down the strict rule that a contingent liability which is dependent on the last day of the accounting period upon a future event is not a deductible accrued liability for the taxable year. The Court there stated:

* * * But no liability accrues during the taxable year on account of cancellations which it is expected may occur in future years, since the events necessary to create the liability do not occur during the taxable year. Except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent. * * *

As we have already pointed out, there was no fixed and certain liability on petitioner's part in either of the taxable years to make any

refunds to its customers of the 2 per cent which it used as reimbursement for collecting and remitting the tax. On this point see the discussion of the Tenth Circuit in *Commissioner v. Security Flour Mills Co., supra,* in which the court said:

Here the taxpayer received from its vendees amounts equal to the processing tax on flour sold during the period in which the injunction was in force. It made no promise or contractual obligation to repay or refund any or all thereof in the event the act was declared unconstitutional, or otherwise. * * * But it became entitled to the money and actually received it in 1935 under claim of right without legal restriction as to its use and disposition, and it therefore constituted taxable income in that year. [Citing authorities.]

The Commissioner contends that as a matter of fact there was never any liability on petitioner's part to refund any of the 2 per cent which it deducted for expenses. The Commissioner contends that what petitioner was legally bound to refund to its customers in 1944 was the 98 per cent which the treasurer of the State of Illinois refunded to petitioner and that petitioner simply acted as a volunteer when it refunded the other 2 per cent. We do not express any opinion as to the merits of respondent's contention in this respect. We do not have the year 1944 before us. We do hold, however, that petitioner was under no legal obligation in either of the taxable years to make any future refunds to its customers of the amounts in question and we therefore sustain the determination of the Commissioner on this issue.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

HILL, *J.*, dissents.

———

DISNEY, **J.**, dissenting: The petitioner, in the taxable years, purchased oil. It did not, until later, fully pay therefor, because of an Illinois statute forbidding. Out of this situation the majority opinion spells income to the petitioner.

Beginning disposition of the question, the opinion says:

* * * We think respondent must be sustained. In the first place, the Illinois statutes did not require petitioner to retain 2 per cent of the amount which it collected to compensate it for the expenses incurred in collecting and remitting to the state the production taxes. The statute permitted the petitioner to deduct for such purposes *not more* than 2 per cent. * * *

Neither party suggested such an argument, and no point whatever is made by either as to the difference between the actual deductions and the 2 per cent. Apparently the actual expense was either 2 per cent, or it was so nearly so that the parties thought the difference was so negligible as to be unworthy of attention. All facts were stipulated. If there had been any appreciable difference, it would doubtless have been noted and relied on. I do not think decision should be based on something the parties altogether disregarded.

Next, after noting that the actual expense was deducted and allowed by the respondent, the majority view is expressed as follows:

This being so, it seems to us petitioner was required to return as gross income the $15,701.95 and $23,151.02 which it retained to reimburse it for these expenses. Otherwise, petitioner would have been receiving deductions for expenses for which in the same year it was being reimbursed by another, and that is not permissible under our income tax laws. * * *

Such conclusion, however, seems at war with the facts. The petitioner was not being "reimbursed by another" for expenses, but, under the coercion of a highly dangerous state law, was retaining its own money out of the price it had agreed to pay for oil, to the extent of expenses approved by the state, forced upon it, at the same time protesting such coercion, proceeding in court to eliminate it, if possible, and assuring the oil producers that *their interests* were being protected, and that in petitioner's opinion the tax would be refunded. Shall we judge such a situation by any ordinary standard of reimbursed expenses? The majority view, moreover, fails to take into consideration the fact that petitioner was in business, and as a part of that business actually incurred the expenses and, therefore, had the usual right to deduct them. Deduction was, or should have been, allowed for that simple reason, and without regard to any retention or reimbursement. Without such, the petitioner would surely not have been denied deduction. Incurring these expenses helped to keep petitioner in business, by complying with a law which might have destroyed its business in Illinois, just as did the expenses approved in *Commissioner* v. *Heininger*, 320 U. S. 467. Conclusion here, in my view, can not logically be based on the fact of expense deduction. In addition, the majority opinion considers the petitioner as if it retained or collected from the oil producers because it had the expense, therefore taxes the amount; whereas, conversely, the petitioner actually incurred the expense because, and only because, it had, through fear of consequences, obeyed the Illinois law, collected the tax, and made the deduction from purchase price. If, therefore, it has and makes no claim of right, and is not without restriction as to disposition of the amount, there is not income.

In *A. P. Giannini*, 42 B. T. A. 546, we, and the Circuit Court affirming, 129 Fed. (2d) 638, held that income may be forced on no man. It has, moreover, long been the law that one who receives income under the claim of right thereto and without restriction as to its disposition, is to be taxed thereon, even though it be later decided that he must repay. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417; *National City Bank of New York, Executor*, 35 B. T. A. 975, and cases there collected; *Commissioner* v. *Los Alamitos Land Co.*, 112 Fed. (2d) 648. On this subject, *Commissioner* v. *Security Flour Mills Co.*, 135 Fed. (2d) 165, says:

\* \* \* Revenue received under claim of right without restriction in respect of its use or disposition constitutes taxable income, even though the one receiving it may thereafter be adjudged liable to restore it or its equivalent. *North American Oil Consolidated* v. *Burnet*, 283 U. S. 417, \* \* \*

\* \* \* But it became entitled to the money and actually received it in 1935 under claim of right without legal restriction as to its use and disposition, and it therefore constituted taxable income in that year. \* \* \*

With most obvious reference to the same idea and to what the Circuit Court had said, the Supreme Court, in *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, specifically pointed out that therein the processor of flour (who was seeking deduction of processing taxes), "in figuring its costs and its sales price to consumers, added the amount of the processing tax, but it collected its purchase price as such and designated no part of it as representing the tax. The petitioner received the purchase price as such." The Court, in my opinion, plainly limited its whole conclusion so as to except and not affect the principle that one not claiming right to income should not be charged therewith. The language is pointless and unnecessary otherwise. And *Brown* v. *Helvering*, 291 U. S. 193, also relied on by the majority opinion here, likewise emphasizes its distinction from such a case as this, when referring to insurance agent's commissions:

\* \* \* When received, the general agent's right to it was absolute. It was under no restriction, contractual or otherwise, as to its disposition, use, or enjoyment. Compare *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. \* \* \*

The majority opinion here specifically states that "The petitioner was required by law to retain the compensation out of a tax which it was required to deduct from the purchase price of oil," and elsewhere repeats that idea. Nevertheless, it is based squarely upon *Security Flour Mills Co.*, *supra*. To me this is a remarkable situation. Taking a case of admittedly forced retention of expense forced upon the petitioner, nevertheless the opinion holds the petitioner to have income, despite the clear exception of just such a situation from the very case primarily and almost entirely relied on, and despite the fact that in the *Security Flour Mills* case the petitioner *denied* liability to its customers, while here the petitioner at all times contended in court that the money belonged to the producers. In the *Security Flour Mills* case the customers intervened and sought the money, and the petitioner resisted. The situation is in substance the reverse of the one here involved.

The gist of the majority opinion is, that since the *Security Flour Mills* case holds that exceptions may not be made to the general rule of accounting because of injustice in not isolating particular transactions and treating them on a long term result, since the petitioner therein was not entitled to a *deduction* for processing tax not paid,

though "included in the sales price of flour," and since the petitioner here could not accrue a liability to the oil producers because of contingency, the petitioner here had income in the amounts involved.

Such treatment gives no consideration whatever to the fact of coercive receipt of the income, and the petitioner's constant and consistent protest against its receipt, the negation of claim of right, as if there was no such element in the case, despite the exception of just such a case by *Security Flour Mills*. That case is no basis for the conclusion here; on the contrary, it recognizes the doctrine upon which the petitioner relies. In *Knight Newspapers* v. *Commissioner*, 143 Fed. (2d) 1007, the court says, in this connection: "No claim of right resulting from the directors' action was ever asserted by any one." In *Walter I. Bones*, 4 T. C. 415, the respondent relied upon the *North American Oil Consolidated* case, but we upheld the petitioner in his contention that he had no income, saying that he had a legal right to refuse a check for commissions where the amount due him was in dispute until later and he was contending for a larger amount. Here, the petitioner had not only a legal ground for contending that the whole matter was unconstitutional, but it never received the money involved from anyone. It already had the money—its own money— and wished to pay it out for oil purchased, but the "legal right" of the statute forbade. The Court of Claims, in *Greenwald* v. *United States*, 57 Fed. Supp. 569, 570, considered a case where the petitioner had received bonuses because of falsification of corporate records by an accountant and, when such falsification was discovered, returned the bonuses. Again the Government relied on *North American Oil Consolidated*, but the court, though recognizing physical receipt of the money, held that because of the mistake of fact, the "claim of right" doctrine did not apply, and the petitioner was not taxable. Here, the mistake was one of law, the whole matter being unconstitutional, and the petitioner, so contending, never made any claim of right. In *Clinton Hotel Realty Corporation* v. *Commissioner*, 128 Fed. (2d) 968, it was held that money received under a lease, but as security for future rent and with no present right or claim of full ownership, "was not income."

Moreover, to affirm, as does the majority opinion, that there is no certainty of offsetting liability to the producers is to admit that the right to income was at least doubtful, for the right to income obviously could not be more certain than the right to offset liability—to say nothing of the disclaimer of right by the petitioner and the enforced receipt—if merely to decline, unwillingly and for fear of a statute, to pay in full for oil purchased, is receipt. I do not think it is. In fact the moneys represent past income of the petitioner, upon which we may assume it paid taxes, and the tax now proposed is merely

because petitioner *has not paid the money out* pursuant to its contract of purchase, because of the legal danger in so doing. This is not income in my view. It might have been breach of contract, since the law was unconstitutional, but it was not the receipt of additional income, but only failure to dispose of income already earned. In the *Security Flour Mills* case, the petitioner sold and actually received money. Here it purchased, yet is said to be in the same position because it did not fully pay until a later year. This appears to me a curious inversion of the principle of the *Security Flour Mills* case. In addition let it be noted that a *deduction* for taxes not paid but contested was sought in *Security Flour Mills*, while here the petitioner primarily seeks to prevent *addition of income*.

The fact that the petitioner merely, because of the command of the statute, failed to pay fully for the oil received disposes also of the idea that it "commingled with its own funds the other 2 per cent," which seems to be relied upon as showing freedom of disposition of the money. The 2 per cent was *already* a commingled part of petitioner's own funds, which it would have paid out under its purchase contract had the law not prevented; and such simple involuntary failure to pay can be no logical proof of such unrestricted dominion over funds received under claim of right as in other cases has caused taxation.

Though the majority opinion finds that the law required retention of the expense money, nevertheless, I think analysis of the reasons for such conclusion will assist in a clear view of the situation here.

The statute not only provided "shall collect" the tax, but also "shall * * * deduct such cost." The petitioner was forced, by dire penalties, both civil and criminal, to collect, or rather here to retain, the 3 per cent tax—the entire 3 per cent. It was thus *required* to retain that portion going to cover expenses, and once retained, if it was income it would be so even though passed on to the state, or returned to the producer. Though the statute permitted petitioner "with the consent of the Department" to "enter into any other contract, for the payment of the tax" it is to be noted that such contract must provide for the "payment of the tax"—3 per cent, so petitioner had no chance, without violation of law, to escape retention of the "expense" portion of the 3 per cent. Note, too, that contracting was possible only by consent of the Department, and though all facts are here stipulated, no such consent appears, and we properly therefore eliminate such consent, and find the petitioner unable to contract. Moreover the statute says nothing of contracting as to the expenses; and in addition their deduction was "subject to the approval of the Department," so not subject to contract. Without such approval, even the amount could not be known; therefore, it would be impossible to contract for

collection of the tax, without inclusion therein of the "expense." Thus we see the petitioner absolutely bound to act as it did. In the face of the statutory mandate of "collect the tax" the taxpayer, however it might wish to let the oil producer keep the amount of expense money, and so escape the present income question, would indeed have been, to say the least, the "incorrigible optimist" had it collected less, and would not have known how to collect less, not knowing what actual expense the Department might approve. The majority opinion could not fail to hold that the retention of the expense money was required.

In this matter I am not at all suggesting that we "make exception to the general rule of accounting by annual periods" as the words of the majority opinion run, but I am suggesting that established law has already made an exception of involuntary receipt of what would otherwise be income, and says it is not income—and that attention solely to the general and sound principles of *Security Flour Mills Co.* v. *Commissioner*, and none to the exception there made and here at hand, disregards such established law, and bypasses the question presented here. The majority relies on no case involving involuntary receipt of income, or income received under claim of right. It merely seeks to extend the generalities of *Security Flour Mills* altogether beyond the extent there intended, and to a case involving different facts and principles.

The petitioner here, from beginning to end, did all that it could to indicate its opposition to the law, including returning the "expense" deduction to the producer. If anything could negative claim of right, it appears to have been done here. In the absence of voluntary collection or retention of the 2 per cent of the tax, the petitioner is shown free from that frame of mind, claim to the money, which in *Commissioner* v. *Wilcox*, 327 U. S. 404, is shown to be controlling, and without which it was held the petitioner there was not taxable. There is no essential difference between the absence of any legal right to money in the embezzler there considered and the absence of any legal right in the petitioner here, under an unconstitutional statute which, *ab initio*, could be no basis of right or imposition of duty. If a petitioner's right to money received is only voidable and not void, he may have income; *Griffin* v. *Smith*, 101 Fed. (2d) 348, where it was held that the petitioner was taxable on compensation since his right to it was voidable only, as distinguished from absolutely void. The case serves to accentuate the fact of no income here, where the whole procedure was unconstitutional. "No rights are conferred, no protection is afforded, and no duties can be imposed, by such a statute," i. e., an unconstitutional statute. 16 Corpus Juris Secundum 289; *Peters* v. *Gilcrest*, 227 U. S. 483; *India Oolithic Stone Co.* v.

*Ridge*, 91 U. S. 994. This is a complete answer to any thought that the petitioner had no obligation, in the taxable years, to complete payment for the oil it had purchased, and not retain any portion thereof. The *Wilcox* case particularly points out that the embezzler had the relation of debtor to the employer. The same is clearly true here, for petitioner had obtained the producer's oil. When we add the fact of petitioner's protest and opposition throughout to the unconstitutional statute and reiterated contention that it was so, I discern, not claim of right, but its antithesis.

In *H. Lewis Brown*, 1 T. C. 760, we distinguished between a claim of right in the *North American Oil Consolidated* case, and a "qualified claim of right" in that though an attorney received money, he recognized that another might not agree with his claim thereto; and we took the later agreement on the amount into consideration, refusing to sustain the respondent's contention of receipt of the entire amount under the *North American Consolidated* case. In *Baird* v. *United States*, 65 Fed. (2d) 911, the court held that, though money received for sale of realty is ordinarily taxable in the year of receipt, yet where in that year the right to retain it was in doubt "because of certain provisions in the agreement," it was not returnable as income. Here we have not even a "qualified claim of right," but a contention that there was no such right.

In no case containing these elements has income been found. Failure to pay out its own funds for such strong reasons later so fully sustained as to unconstitutionality is no logical basis for taxation of income. I do not believe the taxpayer should be ground between the upper millstone of Federal taxes and the lower millstone of a punitive state statute. This case should not be decided without regard to the claim of right doctrine merely because of generalities not considering but excepting it. I therefore respectfully dissent.

ARNOLD and HARRON, *JJ.*, agree with this dissent.

---

HARRON, *J.*, dissenting: I agree with the dissent of Judge Disney, but wish to add as further reasons for my dissent, perhaps at the risk of some repetition, the following:

(1) Petitioner reported income on the accrual method.

(2) In the taxable years petitioner contracted for purchases of oil from oil producers, which created a definite liability in petitioner to pay its vendors the full amount of the contract prices. Therefore, petitioner had to accrue as its costs of oil, in 1941 and 1942, 100 per cent of the contract prices.

Separate and apart from the above was the procedure of collecting a tax for the State of Illinois.

The tax was on the oil producers, not petitioner. They, like petitioner, had to report in income the full amount of the contract prices in 1941 and 1942, and they could deduct as a tax the 3 per cent Illinois tax at some time. Under the holding of *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, if I understand the full import of that decision, the oil producers could not deduct the Illinois tax, for which they denied liability, until the year in which the validity of the tax was established, if the tax was held to be valid. The oil producers denied liability for the tax, as in *Security Flour Mills*. The oil producers had no choice in the matter of paying or not paying the tax.

(3) The Illinois statute had severe compulsory features. (a) It deprived the *oil producers* of any say in paying or not paying the tax, for it required vendees of oil producers to collect the tax out of purchase contract moneys. (b) It compelled *purchasers* of oil, such as petitioner was, to collect the tax, and (c) to pay to themselves the tax collecting costs *out of the tax*. It made purchasers of oil agents of the state, i. e., tax collectors.

Petitioner was caught between the state and those from whom it bought oil. In theory it paid oil producers all of the contract prices, and then collected a tax from them.

Petitioner held back from oil producers 3 per cent of contract prices *as an agent of the state, under a claim of right of the state to a tax.* Two per cent of that tax, *which petitioner had to hold for its expenses*, was also held subject to a claim of right of the state, for petitioner could be paid its tax collecting expenses only out of the tax. Theoretically, all of the tax had to be paid to the state first, before the state could pay costs to the tax collector. The statute short-cut this by requiring the tax collector, petitioner here, to keep part of the tax collected for expenses of tax collecting.

(4) Petitioner incurred expenses in collecting the tax and was out of pocket those expenses. Having incurred such expenses in 1941 and 1942, petitioner had claims against the state for those expenses. This must be recognized, even though the Illinois statute operated in such way that the expenses were supposed to be paid out of the tax moneys. One reason for this is that, whether or not petitioner was ever paid by the state for its expenses, petitioner incurred expenses in fact, and, for income tax purposes, the expenses had to be deducted in the year in which incurred. Deduction could not be postponed until it should become certain whether the state could make payment to reimburse the expense.

The question here is whether petitioner had to report in 1941 and 1942, as income, the amounts for which it had claims against the state,

to wit, $15,000 and $23,000, to use round figures. It is an established rule that a taxpayer reporting income under the accrual method must report income in the year in which his *right* to income and the obligor's obligation to make payment have become final and definite in amount. *Security Flour Mills Co.* v. *Commissioner, supra.*

It has been held that a taxpayer is not required to report as income an amount which it may never receive. *North American Oil Consolidated* v. *Burnet,* 286 U. S. 417. It has been held that, if conditions in a tax year make it uncertain that a taxpayer will ever receive anything at all on its claim, the taxpayer does not have to make any accrual of the income represented by such uncertain claim. *Jamaica Water Supply Co.* v. *Commissioner,* 125 Fed. (2d) 512, 513; certiorari denied, 316 U. S. 698.

(5) The above question can not be fairly decided unless this Court, at the outset, makes a construction of the fact situation which petitioner occupied in 1941 and 1942. This involves a subsidiary question: In what capacity did petitioner hold part of the disputed tax, $15,000 in 1941 and $23,000 in 1942?

The 3 per cent tax was being contested in the taxable years by those on whom the tax was imposed, the oil producers. Petitioner, being put in the position of a tax collector by force of a statute, joined the oil producers in litigation which questioned the validity of the tax. This litigation put in issue *title* to all the funds—the 3 per cent of contract prices—which petitioner had been required to collect. Title to the part of the tax which petitioner was required to keep to cover its tax collecting costs was just as much in question as was title to the part of the tax which petitioner had been required to turn over to the state. There was no provision for putting any of these moneys in the hands of a receiver. But that one fact should not weigh against petitioner. Petitioner could be paid for its tax collecting expense by the state only out of the tax itself (the state could not make payment to petitioner out of its general funds), and, since title to all of the tax moneys was the subject of litigation in 1941 and 1942, it seems clear, and I think should be held, that petitioner held the $15,000 and the $23,000 in 1941 and 1942 as a trustee for such entity as had title to the tax moneys, of which the above sums were a part, or that it was holding these sums as an agent for the state until decision would be made of whether the state was entitled to the entire fund representing the tax.

(6) The construction suggested above removes from this case the argument that petitioner *received* payment from the state in 1941 and 1942. But further reason for concluding that petitioner received nothing from the state in the taxable years in payment for its claim against the state for tax collecting expense, is that the state had no

funds of its own in the taxable years out of which to pay petitioner. Litigation pending on the matter, all that the state had in 1941 and 1942 was an undetermined claim of right to all the tax funds, including the sums held by petitioner. Those sums were held by petitioner, as an agent of the state, subject to a contingency that the state had no title in them. This must be true because petitioner, as a corporation, was contesting the tax, and it had followed the course of collecting the tax and holding out part of the tax moneys under protest, and only under the compulsion of the statute. In other words, petitioner held the $15,000 and $23,000 under the *state's claim of right*, not under its own claim of right. Petitioner contended that the funds belonged to the oil producers.

As has been pointed out before, the state could pay petitioner for its expenses only out of the tax moneys, and if the tax were held invalid, the state could and would pay petitioner nothing. Furthermore, if the tax was invalid, as it was held to be in 1944, it was invalid at all times, and title to the tax moneys, including the sums here in question, was in the oil producers in 1941 and 1942, that is, *ab initio*.

Under all of the facts and the circumstances, I think the conclusion should be that petitioner had only a claim against the State of Illinois in 1941 and 1942 for payment for services rendered to the state, and that in the taxable years the payment by the state of the claim was dependent upon the constitutionality of the tax statute, regarding which litigation was pending; that the existence of the court proceedings created sufficient doubt and uncertainty in the matter of the state's making payment to petitioner for its tax-collecting services so as to require a holding in this case that income did not accrue to petitioner in 1941 and 1942 under its claim against the state. Petitioner might never collect from the state because of the peculiar situation which tied together inseparably the ability of the state to make payment of the costs of collection with the validity of the tax. Also, petitioner's right to receive payment of its costs from the state was tied to the state's right to the tax moneys, which right was not decided until 1944. I think it is correct to say that the *obligation* of the state to pay petitioner for its costs depended upon the state's right to the tax moneys. Both the right of the state to the tax and its obligation to make payment to petitioner were undetermined in the taxable years. In that situation petitioner should not be required to report as income in 1941 and 1942 sums which it might never receive. *North American Oil Consolidated* v. *Burnet, supra; Jamaica Water Supply Co.* v. *Commissioner, supra.*

The situation here is unusual. Petitioner was caught in a complex web which was not of its own making. The circumstances require recognizing the various roles which petitioner had to play, if a fair

result is to be reached. I respectfully note this dissent for the purpose of giving that recognition of the taxpayer's several capacities. I believe that the question presented here should not be decided any differently than it would undoubtedly be decided if all of the tax moneys, and particularly the $15,000 and $23,000, had been held by a trustee or impounded in some way during the time litigation over the validity of the tax was pending, which included the taxable years, because petitioner did not voluntarily get enmeshed; it followed a course under the mandate of a statute.

Another unusual feature is that the normal flow of the moneys was short-circuited in two ways. Money owing from petitioner to oil producers never reached the oil producers. Part of the tax money which the state claimed did not go to the state. Both of these short-cut courses were required by a statute, which was later held invalid. But the requirements of that state statute should not make us unable to see who the claimants to tax money were; why petitioner did not hold any of the tax money under a claim of right of its own; why petitioner was not holding part of the tax money free from restrictions; and that, until the right of the state to the entire fund of tax moneys was determined, petitioner held part thereof as an agent of the state and not under its own claim of right. Petitioner held part of the tax money pending determination of who owned it, the state or the oil producers.

I do not find in the facts that petitioner held part of the tax money under a claim that it belonged to it, as money "paid" by the state on an account due, and that at the same time petitioner claimed that the money belonged to the oil producers. Petitioner was a party, with the oil producers, in suit against the state challenging the validity of the tax. Pending decision of the litigation, petitioner was an unwilling agent of the state.

Respondent has determined that petitioner had taxable income in 1941 and 1942 under an agreement of the State of Illinois to pay it for its services in collecting a tax for the state. The broad question has to do with the tax concept of income. Whether or not petitioner received *income* can not be answered by a superficial reference to *a fund of money*, $15,000 and $23,000, over which petitioner had mere custody pending litigation over title to that fund. If the state statute was invalid those funds, which had become the income of the oil producers in 1941 and 1942 under oil purchase contracts made in those years, never were endowed with the character of state's money derived from a tax. Until the funds first took on the nature of state's money, they could not take on the character of income to petitioner. The question whether the funds were income to petitioner in 1941 and 1942 can not be answered and determined by the naive fact that petitioner

had mere *possession* of the funds in 1941 and 1942. Mere possession of money does not make it income for tax purposes. That has been demonstrated frequently in cases where money held by a trustee, trust income, has been taxed to another person, the grantor of the trust. Here the *money* in question originally was owned by petitioner; it became payable to others under contracts; but by operation of a state statute it became frozen in the custody of petitioner. The money was in such frozen state in 1941 and 1942. That being a fact, I am unable to perceive that the money had become income, from a tax standpoint, to petitioner in 1941 and 1942.

---

OPPER, *J.*, dissenting: It is merely confusing to consider the present proceeding as though petitioner might have been in receipt of income. All that is involved is a matter of deductions and the sole question is whether petitioner's accounts properly reflected its true income. Respondent concedes that petitioner was entitled to accrue and deduct for the expenses actually incurred in collecting and transmitting the withheld tax to the state. All that could be involved, in addition, is to determine whether petitioner is likewise entitled to deduct 100 per cent of the contract price of the oil it purchased, or only 97 per cent, since that is the amount it acknowledged as owing to its vendors.

Unfortunately, the meager stipulation upon which the case was presented does not supply the fundamental information upon which it is possible to determine whether that issue is present. It seems to me that the case should consequently be set down for a further hearing to permit the parties to introduce proof as to the specific bookkeeping entries which petitioner actually made.

If upon that supplemental record it appears that petitioner deducted the full amount which it had contracted to pay to its vendors, the correct result would be, it seems to me, to deny so much of that deduction as constitutes a nonaccruable item in the years before us. Petitioner retained the 2 per cent of the 3 per cent and, notwithstanding its claim of unconstitutionality, apparently proposed to continue to retain it until the question had been set at rest. It did not acknowledge its debt to its vendors unconditionally, and at least as of the end of the tax years in issue it was under no legal liability to make payment. Hence it was prevented from entering a proper accrual at that time. *Security Flour Mills* v. *Commissioner*, 321 U. S. 281.

If, on the other hand, all that it accrued as a liability to its vendors was 97 per cent of the purchase price, the other 3 per cent being accrued in part (98 per cent) as a liability to the state, and the balance (2 per cent) as expenses actually incurred, then its accounting for the transaction was unmistakably correct for the years in issue, and the deficiency would be improper. I see no way, however, to approach a

solution of this apparently confusing controversy without knowledge of that indispensable fact.

I accordingly dissent from the present disposition of the question, even though it might eventuate that the conclusion reached is correct.