KARL HOPE AND HILDA HOPE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2258–65, 3128–69.   Filed March 22, 1971.

*Jules I. Whitman* and *Richard L. Levy*, for the petitioners.
*Dennis C. DeBerry* and *Howard Gordon*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in petitioners income tax as follows:

| Docket No. | Taxable year | Deficiency |
| --- | --- | --- |
| 2258–65 | 1960 | $991, 127 |
| 3128–69 | 1961 | 108, 750 |

The deficiencies determined by the respondent in the instant case arose out of the purported sale by Mr. Karl Hope of 206,400 shares of stock of Perfect Photo, Inc., on July 27, 1960, and reflect the fact that the respondent took an inconsistent position with respect to the year of accountability for, as well as the amount of, the income realized on the sale.

The respondent conceded at trial that counsel's fees of $10,000 were deductible in 1960. The questions remaining for decision are:

(1) Whether the petitioner realized taxable gain in 1960 on account of the purported sale of 206,400 shares of stock of Perfect Photo, Inc.

(2) Whether third-party optionees in substance purchased the petitioner's stock subject to a secured loan without recourse, i.e., a mere pledge of the stock.

(3) Whether the petitioner's stock, as a result of its theft, was compulsorily or involuntarily converted.

(4) Whether it was established in a year subsequent to the sale that the petitioner did not have an unrestricted right to the sale proceeds.

(5) Whether counsel's fees and other costs were deductible in 1961.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The facts necessary for our opinion are as follows:

Petitioners Karl and Hilda Hope are husband and wife. At the time of the filing of their petition, the petitioners resided in East Stroudsburg, Pa. For the taxable years here in question, calendar 1960 and 1961, the petitioners filed their joint income tax returns on the cash method of accounting with the district director of internal revenue, Philadelphia, Pa. Inasmuch as Hilda Hope is a petitioner solely as a result of the filing of a joint return, Karl Hope will hereinafter be referred to as the petitioner.

At all times material hereto, Perfect Photo, Inc. (hereinafter Perfect Photo), was a corporation organized under Pennsylvania law and engaged in the business of developing and printing of photographic film. The petitioner purchased a one-half interest in Perfect Photo in 1946. At that time Perfect Photo was engaged in the photofinishing of black and white film. About 1952, the petitioner purchased the remaining 50 percent.

In 1959, Eastman Kodak released the processing of color film. This enabled Perfect Photo to go into the business of photofinishing color film. As a result, the volume of its business increased from several hundred thousand dollars to several million dollars per annum.

The petitioner and his brother, Henry Hope, were the principal officers and directors of Perfect Photo. The petitioner was involved

in the financial and management aspects of Perfect Photo's business while Henry Hope confined his activities to the technical aspects of the business.

On or about June 1, 1959, Perfect Photo employed Warren G. Grabb (hereinafter Grabb), a management engineer, as a consulting engineer. In September 1959, Grabb became vice president and director of Perfect Photo. On or about August 1959, Perfect Photo employed Harry J. Sentiff (hereinafter Sentiff), a certified public accountant, as a vice president and director. Sentiff became engaged mainly in the financial affairs of Perfect Photo, and Grabb became engaged not only in the financial affairs but also in the management of Perfect Photo.

In October 1959, a public offering was made of the stock of Perfect Photo at $14 per share. A total of 150,000 shares of the stock of Perfect Photo was sold to the public, of which 60,000 shares were sold by Perfect Photo and 90,000 shares were sold by petitioner.

Following the public sale of the stock of Perfect Photo, the petitioner told Sentiff and Grabb, among others, that he wanted to dispose of the remainder of his stock, and the petitioner did sell 3,600 shares of that stock on January 12, 1960, at $37.11 per share. After the petitioner had made an unsuccessful attempt to merge Perfect Photo into another corporation and was otherwise unable to dispose of a large block of his stock, Sentiff discussed the situation with C. Clark Ambrose (hereinafter Ambrose) of Harriman Ripley & Co., Inc., of New York, now doing business as Drexel, Harriman Ripley, Inc. (hereinafter Harriman Ripley Co.). As a result of those discussions, a plan was worked out whereby Harriman Ripley Co. agreed to finance or participate in a purchase of the petitioner's stock interest in Perfect Photo which amounted to 206,400 shares, or approximately 57 percent, of the 360,000 issued and outstanding shares of Perfect Photo stock. However, Ambrose indicated that before Harriman Ripley Co. would proceed with any plan, Sentiff would have to produce written evidence of the petitioner's intention to sell his stock.

At Ambrose's suggestion, Sentiff obtained an agreement from the petitioner granting Sentiff and Grabb the right for a period of 30 days from June 15, 1960, to purchase all of the 206,400 shares of stock of Perfect Photo owned by the Petitioner for the sum of $4 million payable $10,000 upon written notice of exercise of the option on or before July 15, 1960, and the balance in cash on or before August 15, 1960.

On or about June 23, 1960, Ambrose advised Sentiff that Harriman Ripley Co. could not finance a purchase by Sentiff and Grabb because of Federal Reserve Board regulations limiting loans on securities. Ambrose proposed to Sentiff that Harriman Ripley Co. purchase the 206,400 shares of stock from the petitioner at a price of $19.38 per

share for a total of $4,000,032 and give Sentiff and Grabb an option until December 31, 1961, to purchase 154,800 shares or 75 percent of the stock so acquired at the same price per share. Sentiff and Grabb also were to be given proxies to vote the 154,800 shares subject to the option.

Harriman Ripley Co. hoped to earn its profit from the 51,600 shares or 25 percent of the purchased stock that was not subject to the option. Sentiff and Grabb intended to sell part of the option to investors or underwriters and to use the net proceeds of that sale to finance the purchase of the stock subject to the remaining part of the option.

Upon reaching this agreement with Harriman Ripley Co., Sentiff thereupon advised the petitioner that Harriman Ripley Co. would purchase his stock for $4,000,032. Sentiff did not tell the petitioner at that time that he and Grabb were going to receive an option to purchase 75 percent of the stock sold to Harriman Ripley Co.

However, on or about June 25, 1960, the details of the sale and option arrangement were made known to Mr. C. Laurence Cushmore, Jr. (hereinafter Cushmore), the attorney who represented the petitioner in the sale and who was also the secretary of and a director of Perfect Photo and a partner in the law firm that was counsel for Perfect Photo. At that time, Sentiff told Cushmore that as the price of the Perfect Photo stock that was listed on the American Stock Exchange had increased substantially over the prior 10 days he and Grabb felt that some readjustment of the sale and option arrangement had to be made in fairness to the petitioner. However, when Cushmore received the first drafts of the documents of sale on July 8, 1960, he noticed that the option to purchase 75 percent of the stock ran from Harriman Ripley Co. to Sentiff and Grabb. When he asked Sentiff about this matter, he was told that the petitioner as the seller of stock could not be included as an optionee without the risk of violating the margin requirements applicable to listed securities under regulations issued by the Federal Reserve Board.

On or about July 11, 1960, Sentiff told Cushmore that Henry Hope would be included as an optionee with respect to 77,400 shares of the 206,400 shares of Perfect Photo stock that were to be sold by the petitioner to Harriman Ripley Co. This notification followed a meeting of the petitioner, Henry Hope, Sentiff, and Grabb at which the petitioner was told that Sentiff and Grabb were to benefit from the transaction and that the petitioner could not share in those benefits because of Government regulations. At that meeting it was also decided that Henry Hope would share any benefits with Sentiff and Grabb. The petitioner first became aware that Sentiff and Grabb were to be issued options to purchase 75 percent of the stock that was to be sold to Harriman Ripley Co. at this meeting which was held on or before July 10, 1960.

On July 14, 1960, stating that he understood that Henry Hope was to receive one-half of the benefits of the agreement under which the petitioner had granted Sentiff and Grabb the right for a period of 30 days from June 15, 1960, to purchase his 206,400 shares of Perfect Photo stock for $4 million payable $10,000 on written notice of exercise on or before July 15, 1960, and the balance on or before August 15, 1960, the petitioner extended the time to July 25, 1960, for giving written notice and the payment of the $10,000.

Negotiations during June and July of 1960 between Cushmore, acting as counsel for the petitioner, counsel for Harriman Ripley Co., and separate counsel for Sentiff and Grabb culminated on July 15, 1960, in the execution of a purchase agreement between the petitioner and Harriman Ripley Co. as agent for several purchasers as well as for its own account. The petitioner agreed that at a closing date selected by Harriman Ripley Co. prior to August 15, 1960, he would sell his 206,400 shares of Perfect Photo stock at $19.38 per share with any transfer taxes payable by the purchasers. The petitioner's obligation to make the sale of his Perfect Photo stock was subject to the delivery by Harriman Ripley Co. of options to purchase 154,800 shares of Perfect Photo stock at $19.38 per share to Henry Hope, Sentiff, and Grabb in the respective amounts of 77,400, 38,700, and 38,700 shares.

The petitioner's obligation was further conditioned on the delivery by Harriman Ripley Co. of proxies to vote the optioned stock to the optionees. The proxies gave their holders the power to vote the stock solely for the election of directors of Perfect Photo. Although the reason for issuing the proxies was not given, the granting of the proxies to members of the management group was consistent with Harriman Ripley Co.'s opinion that Perfect Photo was in a service business that could best be run by that group.

Harriman Ripley Co.'s obligation to make the purchase was subject to the delivery by Perfect Photo of an agreement providing for the registration at Harriman Ripley Co.'s request of the purchase stock under the Securities Act of 1933. Harriman Ripley Co.'s obligation was further conditioned on the receipt of an opinion of their counsel that neither their purchase nor their delivery of options to Henry Hope, Sentiff, and Grabb would violate the Securities Act of 1933 or the Securities Exchange Act of 1934.

Harriman Ripley Co. selected July 27, 1960, as the closing date. Prior to the closing, Cushmore went over with the petitioner the terms of the purchase agreement of July 15, 1960, which was prepared by counsel for Harriman Ripley Co. Cushmore also attended the closing as the petitioner's counsel. At the closing, the conditions

of sale were satisfied, and the petitioner transferred his 206,400 shares of Perfect Photo stock on receipt of several checks in the total amount of $4,000,032.

In satisfaction of its obligation under the purchase agreement, Harriman Ripley Co. executed and delivered at the closing options and proxies covering 77,400, 38,700, and 38,700 shares of the stock to Henry Hope, Sentiff, and Grabb, respectively. Although the petitioner initially did not know that Harriman Ripley Co. was going to issue options and proxies covering 75 percent of the stock, he received notice of this fact prior to the sale and by extending his option to Sentiff and Grabb on July 14, 1960, indicated his consent to this arrangement.

At the time that Henry Hope received options and proxies covering 77,400 shares of the stock, he had an understanding with the petitioner that he would follow the petitioner's directions with respect to the options and vote the shares the way the petitioner wanted him to vote.

The options ran through December 31, 1961, but could be terminated by Harriman Ripley Co. prior to that date if the price of Perfect Photo stock on the American Stock Exchange fell below $30 for 5 consecutive business days or if Perfect Photo failed on request to file a registration statement with respect to the stock purchased from the petitioner or use its best efforts to cause such statement to become effective at the earliest possible date.

The proxies were irrevocable until December 31, 1961, unless the options were transferred or terminated or if Perfect Photo without the consent of Harriman Ripley Co. issued additional equity interests other than for certain defined purposes.

At the insistence of the petitioner, Henry Hope, Sentiff, and Grabb entered into an agreement, dated July 27, 1960, which provided that neither the options nor the stock acquired by the exercise of the options would be transferred or disposed of in excess of 100 shares during any calendar week without notice to the other parties and an opportunity for the other parties to participate in the disposition. The petitioner's purpose in requiring this agreement was to insure against one of the three optionees selling an interest that might be significant enough to lessen the market value of the interests held by the other optionees.

As the petitioner was selling his stock interest in Perfect Photo, it was requested that he and his brother, Henry Hope, be given employment agreements. At some point during July 1960, the petitioner and Henry Hope received employment contracts.

During June and July 1960, Perfect Photo stock traded at a low of 40½ per share and a high of 66⅞ per share on the American Stock Exchange.

In September 1960, an article appeared in Business Week which stated that the petitioner had sold his stock at $20 a share at a time when Perfect Photo stock was trading over $50. Following this article, the petitioner became dissatisfied with the transaction.

As a result of that dissatisfaction, the petitioner shortly thereafter consulted Harold E. Kohn (hereinafter Kohn) of the law firm of Dilworth, Paxson, Kalish, Kohn & Dilks. It was Kohn's opinion that the petitioner had an excellent prospect of recovery if he sued for a rescission. The petitioner told Kohn to first attempt to recover the stock by negotiation. On Kohn's advice, the petitioner held the sale proceeds in cash and marketable securities pending the settlement of the dispute.

On December 15, 1960, Sentiff and Grabb refused to give up their options, and Harriman Ripley Co. refused to return the Perfect Photo stock that it had purchased from the petitioner. Henry Hope readily agreed to transfer the options issued in his name to the petitioner at any time upon the latter's request.

Approximately 5 months after the sale, on December 21, 1960, the petitioner, on advice of counsel, filed a complaint in the U.S. District Court for the Eastern District of Pennsylvania naming as defendants Harriman Ripley Co., Sentiff, and Grabb. The complaint alleged, in part, that:

in or about January, 1960, defendants Sentiff and Grabb, pursuant to a conspiracy between them to defraud plaintiff, and in abuse and violation of their confidential and fiduciary duties to plaintiff, commenced efforts to induce him to sell the remaining 206,400 shares of stock of Perfect [Photo] owned by him, at a price substantially below the market price and the actual and fair value of said shares, concealing from him their intention to acquire the same for themselves.

It was also alleged that Sentiff and Grabb knew that the petitioner could have obtained a sales price in excess of $8 million for those shares.

After a statement of the grounds relied upon, the complaint, in part, requested:

1. That defendants and each of them be ordered and required to rescind the the transactions complained of, to return to plaintiff the aforesaid 206,400 shares of stock of Perfect [Photo], of which he has been defrauded, and to execute such documents as may be necessary to effectuate such rescission of record, upon repayment of the aforesaid sum of $4,000,000, together with the net earnings thereon.

Other than a prayer for punitive damages together with costs and reasonable counsel fees, the sole relief sought was for rescission and matters ancillary thereof.

The complaint further stated that Henry Hope, who was not named as a defendant, had informed the petitioner that he acquiesced in the rescission and would perform such acts and execute such documents

necessary to effectuate a rescission. On March 24, 1961, Henry Hope did, in fact, assign to the petitioner the option to purchase 77,400 shares of Perfect Photo stock from Harriman Ripley Co.

Settlement negotiations between the parties to the suit culminated in the filing with the court on March 24, 1961, of a stipulation of dismissal in which counsel for the parties stipulated and agreed that the petitioner's action "be dismissed with prejudice as to all defendants named in the Complaint, without cost to any party." The basis of settlement was as follows:

(a) Sentiff and Grabb received $350,000 from the petitioner in consideration of their assignment to him of their options to purchase 77,400 shares of Perfect Photo stock from Harriman Ripley Co.;

(b) Sentiff and Grabb returned to Harriman Ripley Co. their proxies to vote the shares subject to the options that they assigned to the petitioner;

(c) Harriman Ripley Co. waived the requirement in the option agreement that an optionee give Harriman Ripley Co. at least 5 days' written notice of a transfer;

(d) Harriman Ripley Co. confirmed that to the best of its knowledge the options assigned to the petitioner by Henry Hope, Sentiff, and Grabb were valid and binding instruments and delivered to the petitioner proxies to vote the 154,800 shares of Perfect Photo stock that were the subject of the options assigned to the petitioner; and

(e) As Henry Hope, Sentiff, and Grabb no longer held options to purchase Perfect Photo stock, they rescinded, terminated, and canceled their agreement which provided that neither the options nor the stock acquired by the exercise of the options would be transferred or disposed of in excess of 100 shares during any calendar week without notice to the other parties and an opportunity for the other parties to participate in the disposition.

During the week which included March 24, 1961, Perfect Photo stock traded at a low of 44⅝ per share and a high of 48⅞ per share.

Shortly after the petitioner filed his complaint in the U.S. District Court, the U.S. Securities and Exchange Commission requested that it be apprised of developments and the Pennsylvania Securities Commission after an investigation ordered a hearing before the full commission. The hearing before the Pennsylvania Securities Commission was held on April 19, 1961. At that hearing the commission was informed that the litigation brought by the petitioner had been settled.

On May 4, 1961, the Pennsylvania Securities Commission sent letters to Harriman Ripley Co., Sentiff, and Grabb which contained the following statements with regard to their investigation of the sale:

This is to advise you that the Commission, upon its investigation and consideration of the evidence presented before it in reference to the aforesaid

matter, has concluded that you have engaged in activities in violation of The Pennsylvania Securities Act which would justify, among other things, the entry of an order of rescission by it against you.

However, in view of the fact that a settlement has been made, satisfactory to all parties, which, in the opinion of the Commission would be equivalent in effect to compliance with an order of rescission, the Commission has determined to waive the entry of any formal order and is accordingly marking this case closed.

The letters cautioned against any recurrence of "the type of practices revealed in this matter" and the letters addressed to Sentiff and Grabb also cautioned against their engaging in the sale of securities without registering as a dealer or salesman.

The petitioner had until December 31, 1961, to exercise his options to acquire the 154,800 shares of Perfect Photo stock held by the Harriman Ripley Co. Although the petitioner discussed the possibility of an early exercise of his options, he decided to wait until the end of the option period, as the Harriman Ripley Co. would not accept an option price of less than the agreed price.

After a request by the petitioner's counsel to extend the termination date of the options was denied, the petitioner delivered written notice to the Harriman Ripley Co. on December 18, 1961, of his intention to exercise his options on December 29, 1961. On December 29, 1961, in order to reflect a 3-for-1 split of Perfect Photo stock that occurred on July 3, 1961, the Harriman Ripley Co. delivered certificates evidencing 464,400 shares of Perfect Photo stock to the petitioner in consideration of the receipt of the agreed option price of $3,000,024. In 1962 and 1963, the petitioner sold a total of 464,340 of those shares at an average per share price of approximately $4.65.

The petitioner paid Dilworth, Paxson, Kalish, Kohn & Dilks counsel's fees of $85,000 in 1961 for conducting and settling the litigation involving Sentiff, Grabb, and the Harriman Ripley Co. and for effecting the delivery of the 464,400 shares of Perfect Photo stock from the Harriman Ripley Co.

In his 1960 tax return, the petitioner disclosed the transfer of 206,-400 shares of Perfect Photo stock for $4,001,632 ($19.38 per share, plus $1,600 stock transfer tax paid by the Harriman Ripley Co.). However, the petitioner did not include in income his gain on the sale on the grounds that the transfer was not a completed sale on which gain was "recognized" in 1960. In his notice of deficiency, dated February 15, 1965, the respondent determined that the petitioner realized in 1960 a taxable gain of $3,939,712 on the sale of 206,400 shares of Perfect Photo stock to Harriman Ripley Co.

In his 1961 tax return, the petitioner reported $4,001,632 as proceeds from the sale, reduced the proceeds by the $3,000,054 [1] paid to Harri-

---

[1] The correct figure was $3,000,024.

man Ripley Co. on the exercise of the options and by the $350,000 paid to Sentiff and Grabb, and reported $651,578 as net proceeds from "shares deemed sold." In computing his gain, the petitioner used his original cost basis in the 51,600 shares of Perfect Photo stock that were not subject to the option increased by counsel's fees of $85,000. In his notice of deficiency, dated April 24, 1969, the respondent determined in the alternative to his prior determination of February 15, 1965, that the petitioner realized in 1961 a taxable gain of $986,098 on the sale of 51,600 shares of Perfect Photo stock.

OPINION

1. *The petitioner's suit for rescission did not postpone the realization of taxable gain on the completed sale.*—The facts of this case conclusively establish that on July 27, 1960, the petitioner sold 206,400 shares of Perfect Photo stock to Harriman Ripley Co. as agent for several purchasers as well as for its own account. The sale was completed on that date when title and possession of the certificates were transferred by the petitioner to Harriman Ripley Co., and the petitioner received $4,000,032 as payment in full. For the purposes of determining when the contract of sale was executed, it is immaterial whether Harriman Ripley Co., the ostensible purchaser, was acting on its own and its disclosed principals' behalf or on the behalf of others. The petitioner received the money from the sale without any restrictions on his use or disposition of those funds.

Some months after the sale of the stock but within the same taxable year, the petitioner became dissatisfied. This dissatisfaction cannot be attributed to the supposed discovery that Sentiff and Grabb might stand to benefit from the transaction. The petitioner knew this prior to the sale, and the specific benefits that Sentiff and Grabb were to receive were clearly spelled out in the sales agreement which the petitioner examined in the presence of his attorney. The petitioner's dissatisfaction cannot be attributed to the issuance of an option to purchase 77,400 shares of stock to his brother, Henry Hope, as the petitioner knew of and consented to that arrangement. Thus, it is clear that the petitioner's dissatisfaction resulted solely from the fact that he felt that the price of the stock that he had sold had been inadequate.

As a result of his dissatisfaction, the petitioner consulted Dilworth, Paxson, Kalish, Kohn & Dilks, who advised the petititoner that there were grounds for a suit to rescind the sale. After unsuccessfully attempting to reach a settlement with the purchaser, the petitioner filed such suit on December 21, 1960, naming as defendants Harriman Ripley Co., Sentiff, and Grabb. That suit was pending at the close of 1960.

With respect to taxpayers who file their returns on the cash receipts and disbursements method of accounting, section 451(a) [2] provides that income shall be included in the return "for the taxable year in which received by the taxpayer." *Boyce* v. *United States*, 405 F. 2d 526 (Ct. Cl. 1968). Although the petitioner does not question the general rule that a cash basis taxpayer must return income from a completed sale in the taxable year in which he receives the sale proceeds (secs. 61(a) (3), 451(a) ; sec. 1.451–1(a), Income Tax Regs.), he contends that his complaint requesting a rescission of the sale postponed his obligation to return the income from the sale until the year in which the suit was settled. We are unable to agree.

The petitioner parted with his stock and received $4,000,032. The fact that the petititoner voluntarily held the sale proceeds in cash and marketable securities was not such a use of the funds as would change the character of the proceeds as income.

The petitioner relying on *Bates Motor Trans. Lines* v. *Commissioner*, 200 F. 2d 20 (C.A. 7, 1952), affirming 17 T.C. 151 (1951) ; *United States* v. *Merrill*, 211 F. 2d 297 (C.A. 9, 1954) ; *J. W. Gaddy*, 38 T.C. 943 (1962), reversed in part on other issues 344 F. 2d 460 (C.A. 5, 1965), contends that the gain derived in the 1960 sale must be eliminated from that accounting period, as he disclaimed his rights to the sale proceeds in the year of receipt.

The cases relied on by the petitioner establish an exception to the claim-of-right doctrine that applies when in the year of receipt a taxpayer recognizes his liability under an existing and fixed obligation to repay the amount received and makes provisions for repayment. *J. W. Gaddy*, *supra*. This exception cannot be applied in the instant case, as the petitioner was never under an existing and fixed obligation to repay the sale proceeds.

The petitioner's contingent liability to pay back an amount equivalent to the proceeds received on the sale if his suit for rescission was successful imposed no restriction upon his use of the money in his hands. *Commissioner* v. *Brooklyn Union Gas Co.*, 62 F. 2d 505 (C.A. 2, 1933), affirming 22 B.T.A. 507 (1931).

*Harry F. Doyle*, 39 B.T.A. 940 (1939), affd. 110 F. 2d 157 (C.A. 2, 1940) ; *Guffey* v. *United States*, 339 F. 2d 759 (C.A. 9, 1964) ; and *Sohio Corporation* v. *Commissioner*, 163 F. 2d 590 (C.A. D.C. 1947), reversing 7 T.C. 435 (1946), are distinguishable. *Harry F. Doyle*, *supra*, and *Guffey* v. *United States*, *supra*, involved executory contracts.

*Sohio Corporation* v. *Commissioner*, *supra*, involved the exclusion from gross income of amounts which an accrual basis taxpayer at no

---

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

time asserted a right to retain but which the taxpayer was compelled by State law, over its formal and repeated protests, to collect. Furthermore, the holding that an accrual basis taxpayer does not derive income with respect to an amount actually received and not subject in the year of receipt to an offsetting obligation to refund is in our opinion incorrect.

Assuming that when he requested the rescission he chose to limit himself to that remedy, and regardless of whether there might have been probable cause, the mere filing of the suit by the petitioner was not of itself sufficient to postpone the realization of gain on the completed sale. *Commissioner* v. *Brooklyn Union Gas Co.*, *supra*. Under the long-established principle of annual accounting for tax purposes, the gain resulting from the sale was taxable in 1960. *United States* v. *Lewis*, 340 U.S. 590 (1951); *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931); *Commissioner* v. *Brooklyn Union Gas Co.*, *supra*.

2. *Settlement of the petitioner's suit did not result in a rescission of the original sale.*—The petitioner contends that his receipt in March 1961 of the options and proxies issued with respect to the 154,800 shares of Perfect Photo stock, or alternatively his receipt in December 1961 of the stock itself, was tantamount to a rescission that limited his gain on the sale to that derived from the 51,600 shares retained by Harriman Ripley Co.

This Court is not faced with the situation where the sale is rescinded in the same year. Compare *Penn* v. *Robertson*, 115 F. 2d 167 (C.A. 4, 1940). In fact, it is not necessary to decide what might have been the result if the sale had been rescinded in the following year. Compare *Penn* v. *Robertson*, *supra*, with *Ripley Realty Co.*, 23 B.T.A. 1247 (1931), affirmed per curiam 61 F. 2d 1038 (C.A. 2, 1932). It is clear that the settlement of the suit filed by the petitioner was not tantamount to a rescission at any time.

With respect to the optioned stock, the petitioner contends that Sentiff, Grabb, and Henry Hope were the real purchasers of the stock with Harriman Ripley Co. merely acting as a lender of funds for which it received 51,600 shares of the stock. Assuming that the facts establish this to be the substance of the 1960 sale, the petitioner next contends that he and the actual purchasers rescinded the sale in 1961. While we agree with the petitioner's observation that the substance of a transaction must prevail over its form (*Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945)), and that the rule may work for the benefit of the taxpayer as well as the Government (*Frank Ciaio*, 47 T.C. 447 (1967)); *Maynard Hospital, Inc.*, 52 T.C. 1006 (1969), we do not find that the realities of the transactions that are the subject of the instant case differ from the form in which they were cast.

There is no doubt that Sentiff and Grabb were interested in purchasing a part of the stock and that Harriman Ripley Co. issued them

the options to accomplish their goal. It also appears that Henry Hope was included as an optionee as an additional inducement for the petitioner to complete the sale, which inducement can be reasonably traced to the sharp increase that occurred during the negotiations in the price of the Perfect Photo stock that was listed on the American Stock Exchange. While the transaction might have the same attributes as a nonrecourse loan by Harriman Ripley Co. to the optionees, it does not follow that, as to petitioner, the sale should be set aside.

At no time did Sentiff, Grabb, or Henry Hope agree to purchase stock from the petitioner or become indebted to Harriman Ripley Co. on account of the 1960 sale. At all times after the sale and until the petitioner exercised the options, title to the stock subject to the options held by Sentiff, Grabb, and Henry Hope, as well as risk of loss with respect to that stock, rested with Harriman Ripley Co. Sentiff, Grabb, and Henry Hope were not the owners of that stock. An option is not considered a present interest in stock. See *Winthrop M. Crane III*, 45 T.C. 397 (1966); *Max H. Wyman*, 33 T.C. 622 (1959).

Sentiff, Grabb, and Henry Hope were given the right to vote the shares subject to their options for the election of directors. However, this right cannot be considered as placing ownership of the stock in them. Harriman Ripley Co. granted that right as it, as the owner of the stock, believed that the current management should be allowed to continue to operate the business. By giving Sentiff, Grabb, and Henry Hope, who agreed to vote his proxies as directed by the petitioner, control over the board, which included directors other than themselves, the management of the business was placed squarely in their hands.

The petitioner's reliance on *Union Planters Nat. Bank of Memphis* v. *United States*, 426 F. 2d 115 (C.A. 6, 1970), and *American National Bank of Austin* v. *United States*, 421 F. 2d 442 (C.A. 5, 1970), is misplaced. It is true that Harriman Ripley Co. could terminate the options if the stock fell below $30 and attempt to market the stock at a price in excess of its cost. However, this was in no way comparable to the understandings in the *Union Planters Nat. Bank of Memphis* and *American National Bank of Austin* cases that the basic risk of ownership of securities would remain with the "sellers."

Once we recognize that Harriman Ripley Co., rather than the optionees, was the actual purchaser of the stock, it cannot be argued that there was ever a rescission of the original sales contract. The seller paid $350,000 to Sentiff and Grabb, the perpetrators of the alleged fraud, and received from them and his brother, Henry Hope, the assignment of their respective rights under an option to purchase three-fourths of the stock from Harriman Ripley Co. That firm's ownership of the stock was unaffected by the agreement entered into as a result of

the suit for rescission. Harriman Ripley Co. gave up nothing. When Harriman Ripley Co. transferred the optioned stock to the petitioner in 1961, it was pursuant to the original sales agreement.

Once the petitioner obtained the options, he had an election either to buy back the stock or to keep the money and allow the transaction to stand. This was a valuable right for which the petitioner was "out of pocket" by the sum of $350,000. In recognition of the value of this right, the petitioner sought a discount for giving it up. Later his counsel sought to obtain additional time within which to make a decison as to the exercise of the options. It is obvious that if the precipitous decline in the market price of the stock had occurred prior to the date on which the petitioner had to exercise the option, the petitioner would not have repurchased the stock and would not be before this Court. This element of choice cannot be reconciled with the petitioner's claim that the sale was rescinded.

It is clear that the settlement which resulted in the reacquisition of 154,800 shares of the stock was a new transaction that had no effect upon the petitioner's tax liability for 1960. *Ripley Realty Co., supra.*

As we are concerned with whether gain realized in a prior year may be limited by the events of a subsequent year, rather than with the characterization of amounts received in the year of settlement of litigation, *Margery K. Megargel*, 3 T.C. 238 (1944), and *Albert J. Goldsmith*, 22 T.C. 1137 (1954), relied on by the petitioner are inapplicable.

If an inequity exists, it is the inability of the petitioner to carry back his 1962 and 1963 losses and apply those losses against his 1960 gain, a result that can be changed only by the Congress.

3. *The petitioner's stock was not compulsorily or involuntarily converted.*—The petitioner contends that he was induced to sell his stock by fraud and false pretenses such as constitutes theft within the meaning of section 1033 (a) and that by exercising the options he acquired property similar or related in service or use to the property converted so as to cause the nonrecognition of gain from the sale to the extent of his reinvestment. Specifically the petitioner alleges that Sentiff and Grabb made false representations as to the adequacy of the sales price and thus that the sale involved the criminal appropriation of his stock in violation of both Pennsylvania law ("Cheating by fraudulent pretenses," Pa. Stat. Ann., tit. 18, sec. 4836 (1963) ; "Conspiracy to do unlawful act," Pa. Stat. Ann., tit. 18, sec. 4302 (1963)) and Federal law ("Mail Fraud," 18 U.S.C. sec. 1341).

The term theft as used in the Internal Revenue Code is a word of general and broad connotation intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and

any other form of guile. *Edwards* v. *Bromberg*, 232 F. 2d 107 (C.A. 5, 1956); *Perry A. Nichols*, 43 T.C. 842 (1965); and *Robert S. Gerstell*, 46 T.C. 161 (1966).

It has been held by the courts of Pennsylvania that a criminal false pretense is "the false representation of an existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does, in fact, deceive, and by means of which one person obtains value from another without compensation." *Commonwealth* v. *Evans*, 190 Pa. Super 179, 154 A. 2d 57 (1959), affirmed per curiam 160 A. 2d 407 (1960).

This is not a case where there has been a prior adjudication or admission of fraud. On the contrary the suit filed by the petitioner was contested. The Pennsylvania Securities Commission stated that in their opinion Sentiff, Grabb, and Harriman Ripley Co. had engaged in activities in violation of the Pennsylvania Securities Act which would justify the entry of an order of rescission of the sale. However, the nature of the violations of the Act was not stated, and the commission did not indicate that Sentiff, Grabb, or the Harriman Ripley Co. engaged in fraudulent practices even though the Act specifically dealt with such practices. See Pa. Stat. Ann., tit. 70, sec. 52 (1963).

The petitioner clearly wanted to sell his stock. Whether the price paid, namely $4 million, was adequate involved a question of judgment. Certainly the petitioner was best qualified to make that judgment. He had already made several efforts to sell the company or to merge with another company. He had sold some of his stock. He had acquired similar businesses. Better than anyone else he certainly knew what the future risks and prospects might entail.

The market quotation with respect to the shares that were traded on the American Stock Exchange would not necessarily be determinative of value of the shares sold to Harriman Ripley Co. Admittedly the petitioner's 206,400 shares could not have been sold on the American Stock Exchange without driving down the price. Once it became known that the petitioner was "selling out," the result could be disastrous.

On the other hand, if offered privately as a block carrying with it control of Perfect Photo, the stock would be valued on a different basis. One buyer might be willing to pay more for control. Another less, if the stock had to be fed into the market, to take into account the fact that the seller was the principal executive officer upon whom Perfect Photo largely depended for its success.

In short, the position of both parties to the sale negates a finding that the price was not "right." The petitioner certainly must be assumed to have had a better knowledge with respect to the business and its future potential than any outsider. Harriman Ripley Co. was ex-

perienced in this type of transaction and must have known what was being sold. We are thus unable to conclude that the consideration was so inadequate as to impute fraud.

The petitioner also knew that Sentiff and Grabb stood to benefit from the transaction. There was no concealment at the time of sale. The appropriate occasion for the petitioner to complain was when he first learned that Sentiff and Grabb were to participate in the benefits of the sale.

The petitioner states on brief that his suit for rescission contained all the allegations essential to establish the Federal crime of mail fraud. Without attempting to adjudicate the scope of that complaint, it is sufficient to state that there is not a scintilla of evidence of an intent to defraud within the meaning of that statute. Also, the record is devoid of evidence of a conspiracy to do an unlawful act.

4. *The petitioner was never obligated to return any portion of the sale proceeds to Harriman Ripley Co.*—The petitioner contends that his 1961 tax liability can be computed taking into account section 1341. The availability of the section is conditioned on the petitioner's showing that a deduction was allowable for 1961 "because it was established after the close of * * * [1960] that the taxpayer did not have an unrestricted right to * * * [the proceeds of the 1960 sale]."

The facts of the instant case do not satisfy that condition as under the terms and conditions of the 1960 sale the petitioner was never obligated to return any portion of the sale proceeds to Harriman Ripley Co. See *George L. Blanton*, 46 T.C. 527 (1966), affirmed per curiam 379 F. 2d 558 (C.A. 5, 1967). In addition, the petitioner has not shown any payment to Harriman Ripley Co. that was deductible.

5. *There is no basis for finding that the petitioner incurred a loss on account of theft or fraud.*—The petitioner contends that the $85,000 counsel's fees paid in attempting to effect a recovery of his property are deductible as a theft loss under section 165(c)(3). If the petitioner's stock had been appropriated by false pretenses, counsel's fees incurred in connection with that theft might have been deductible as additional or collateral theft losses. See *Katherine Ander*, 47 T.C. 592 (1967). However, we have been unable to find that the sale involved a criminal appropriation and thus the counsel's fees are not deductible under section 165(c)(3).

This leaves the question of whether the counsel's fees are deductible under sections 212 or 162 as ordinary and necessary expenses relating to the petitioner's sale as an investor and controlling stockholder of Perfect Photo or as the principal officer of that firm.

The counsel's fees were for conducting and settling the litigation involving Sentiff, Grabb, and Harriman Ripley Co. and for effecting delivery of the 464,400 shares of Perfect Photo stock from Harriman Ripley Co. To the extent that these fees were attributable to the litiga-

tion, they were capital expenditures since they were costs incurred in the petitioner's attempt to reacquire a capital asset. *Spangler* v. *Commissioner*, 323 F. 2d 913 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Munson* v. *McGinnes*, 283 F. 2d 333 (C.A. 3, 1960). The fact that the suit was unsuccessful in that Harriman Ripley Co. did not return the stock for the sale proceeds does not render the fees ordinary and necessary expenses rather than capital expenditures. *Radio Station WBIR, Inc.*, 31 T.C. 803 (1959), *Stass Reed*, 55 T.C. 32 (1970). To the extent that the fees were attributable to the delivery of stock, they were also capital expenditures. *Stephens Fuel Co., Inc.*, 13 B.T.A. 666 (1928).

As the firm's principal officer, it must be assumed that the petitioner was also interested in recovering control of Perfect Photo. However, the litigation involved in essence whether he had grounds to reacquire the stock which embodied that as well as other rights. Also, even if it were determined that the voting rights should bear some of the expense, an allocation could not be made on the basis of this record.

The $350,000 paid to acquire the option was a cost of the option and not a deductible expense. *Stires Corporation*, 28 B.T.A. 1 (1933).

Accordingly, the respondent properly allocated these payments to the stock acquired by the petitioner on his exercise of the options.

Reviewed by the Court.

*Devisions will be entered under Rule 50.*