T.C. Memo. 1996-127

UNITED STATES TAX COURT

RICHARD L. HUTCHESON AND DOLORES A. HUTCHESON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8886-94.                    Filed March 14, 1996.

<u>Robert E. Bergin</u>, for petitioners.

<u>Ewan D. Purkiss</u>, for respondent.

MEMORANDUM OPINION

RAUM, <u>Judge</u>:  The Commissioner determined a deficiency in
petitioners' 1989 income tax in the amount of $809,180.  The
issues for decision are:  (1) Whether petitioners must recognize
the entire gain from the sale of 100,000 shares of WalMart stock

in January 1989 even though they "repurchased" 96,600 shares of WalMart in December 1989, and alternatively (2) whether the sale and "repurchase" of the stock qualifies as an involuntary conversion under section 1033.[1]

At the time of the filing of the petition, Richard and Dolores Hutcheson, petitioners, resided in Fresno, California. References to petitioner in the singular will be to petitioner husband.

In May 1983, petitioners opened a cash management account, account no. 567-96135, with the Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) Fort Smith, Arkansas, office. Account no. 567-96135, managed and controlled by petitioner, included a margin account. Petitioner delivered WalMart stock to Merrill Lynch for deposit in the account. At all times, the account held only WalMart stock. The account executive assigned to the account was Ms. Ed Dell Wortz, petitioner's maternal grandmother's niece. She had been with Merrill Lynch in Fort Smith, Arkansas, since 1980 and had been in the securities industry since 1955.

Petitioner's total annual sales through the account for 1983 through 1988 are summarized as follows:

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

| Year | Shares | Sales Price |
|------|--------|-------------|
| 1983 | -- | -- |
| 1984 | 2,000 | $ 80,199 |
| 1985 | 15,000 | $537,979 |
| 1986 | 18,000 | $748,081 |
| 1987 | 15,500 | $812,326 |
| 1988 | 31,200 | $891,008 |

Late in 1988, petitioner was advised by his account executive, Ms. Wortz, that he needed to reduce the amount owed in the margin account between $400,000 and $600,000. Petitioner and Ms. Wortz agreed to make the margin account reduction in early January 1989. This agreement was not reduced to writing.

Prior to January 3, 1989, Merrill Lynch held in the securities account 192,514 shares of WalMart stock. The stock was valued at $6,040,126. By that time, petitioners through their margin account had borrowed $3,080,889.75 and had $567,137 of available credit. The basis of the stock was eleven cents ($0.11) per share.

On January 3, 1989, petitioner telephoned Ms. Wortz from Fresno, California. He understood his telephone instruction to Ms. Wortz to be to sell $100,000 worth of WalMart. She understood his instruction to be to sell 100,000 shares of WalMart. On that day, January 3, 1989, Merrill Lynch made the following sales on behalf of petitioner and account no. 567-96135:

| WalMart Shares | Charge or Mark-up | SEC Fees | Handling | Gross Price |
|---|---|---|---|---|
| 69,200 | $8,515.06 | $69.20 | $2.35 | $2,076,000 |
| 10,500 | $1,292.35 | $10.59 | | $ 317,625 |
| 20,300 | $2,497.92 | $20.39 | | $ 611,537 |

Merrill Lynch sold 69,200 shares at 30; 10,500 at 30-1/4; and 20,300 at 30-1/8. Merrill Lynch used the proceeds from the January 3, 1989, sales to pay off most of petitioners' margin indebtedness. A sale of 3,400 shares of Walmart (sales were always made in multiples of 100) at 30-1/4 (the highest price received for WalMart shares on January 3) would have grossed $102,850 and netted approximately $102,426 to reduce petitioners' margin debt.

During subsequent attempts to resolve the dispute, Merrill Lynch, in order to accommodate petitioner, offered to "repurchase" WalMart stock "in excess of 10,500" (as stipulated by the parties), and offered a refund of the commission on the January 3 sales and to waive the commission on the "repurchase". Petitioner rejected the offer on about January 17, 1989, in a letter to Merrill Lynch's Little Rock, Arkansas, manager. Petitioner closed account no. 567-96135 on or about March 15, 1989, by having Merrill Lynch retransfer the remaining WalMart shares in the account.

By December 28, 1989, the price of WalMart had risen to 44-1/2. On December 28, 1989, petitioner and Merrill Lynch agreed

to reopen account no. 567-96135.  Merrill Lynch provided $2,948,702 of margin funds and petitioner deposited fresh funds of $1,350,000 (which he had borrowed from his father) into the account to purchase WalMart and to reestablish petitioner's position in WalMart common stock.  At petitioner's direction, Merrill Lynch acquired 96,600[2] shares of WalMart common stock on his behalf for the account for a total purchase price of $4,298,702.  Merrill Lynch waived the purchase commissions and located year end sellers of stock which had recently increased substantially in value.

Petitioner had borrowed the $1,350,000 from his father, as noted above, in order to complete the December 28, 1989, purchase.  Prior to that time, petitioner was not indebted to his father for the purchase of any WalMart shares.  The parties stipulated that petitioner's purpose for the December 28 purchase was to reacquire his investment in WalMart and to formally implement a rescission of the January 3 sales in the same year by attempting to bring the case within situation one of Rev. Rul. 80-58, 1980-1 C.B. 181, hereinafter described.  The IRS did not stipulate that petitioner's action accomplished a rescission.

Petitioners filed a formal arbitration claim for rescission against Merrill Lynch with the National Association of Securities

---

[2] Petitioners do not contest the sale of the first 3,400 shares, since their sale approximates the $100,000 worth of Walmart stock petitioner unquestionably authorized.

Dealers as required by the cash management account agreement on December 29, 1989. The arbitration claim was settled in October 1990. Merrill Lynch agreed to pay petitioners $250,000 but did not admit any liability in making the January 3 sales of petitioner's WalMart stock.

The 96,600 shares of Walmart stock purchased by Merrill Lynch on behalf of petitioner and account no. 567-96135 on December 28, 1989, were not the same shares of stock sold on January 3, 1989. The number of purchased shares represented the equivalent shareholder rights as the 96,600 shares sold on January 3, 1989. The January 3, 1989, sales were to unrelated third parties and the sales were without condition, other than payment for the shares of stock. The January 3 purchasers of the WalMart shares did not agree, at the time of sale, or at any other time, that Merrill Lynch on behalf of the account or petitioner could repurchase the shares.

Section 61(a)(3) includes in gross income "all income from whatever source derived, including * * * Gains derived from dealings in property". Section 1001(a) defines the amount of gain from sale or other disposition of property as "the excess of the amount realized therefrom over the adjusted basis". Section 1001(c) requires that "Except as otherwise provided in this subtitle, the entire amount of the gain or loss * * * on the sale or exchange of property shall be recognized." Petitioners do not dispute that there was a sale of stock which gave rise to a

corresponding realization of gain. They contend, however, that because they rescinded the January 3 sale to the extent of 96,600 shares, they need not recognize the gain on those 96,600 shares at this time. Alternatively, they argue that the sale of the stock to the extent of 96,600 shares by Merrill Lynch was an involuntary conversion pursuant to section 1033 which enables them to claim nonrecognition treatment.

1. Rescission

Rev. Rul. 80-58, 1980-1 C.B. 181 discusses two situations involving the income tax consequences of a reconveyance to a taxpayer of property previously sold by that taxpayer. In the first situation, A sold B a tract of land in 1978. The contract required A to accept the land back if B was unable to obtain business zoning within 9 months after the sale. Later that year, when B failed to get the zoning, he returned the land to A, and A returned the sales price. In the second situation, the facts are the same except that the period within which B could reconvey the property to A was 1 year and the reconveyance occurred in 1979. Id. at 181.

Rev. Rul. 80-58, supra, defines rescission as "the abrogation, canceling, or voiding of a contract that has the effect of releasing the contracting parties from further obligations to each other and restoring the parties to the relative positions that they would have occupied had no contract been made. A rescission may be effected by mutual agreement of

the parties, by one of the parties declaring a rescission of the contract without the consent of the other if sufficient grounds exist, or by applying to the court for a decree of rescission." Id. at 181-182. When the annual accounting principle is taken into account, however, it supersedes the rescission if the rescission occurs in a different year. Id.

In situation one, the rescission occurred in the same taxable year as the sale. As a result, the income tax consequences of the original sale would be disregarded for Federal income tax purposes. In situation two, the rescission did not occur until the following year. At the end of the sale year, A and B were not in the same positions they were in before the sale. In consequence, only the events of the first year, 1978, are considered in determining A's and B's income tax liabilities for 1978. "In both situations, the annual accounting period principle requires the determination of income at the close of the taxable year without regard to subsequent events." Id. at 182.

Petitioners liken themselves to the taxpayers in situation one above. In petitioners' case, the original sale took place on January 3, 1989, when the 100,000 shares of WalMart stock were sold. After unsuccessful negotiations with Merrill Lynch, petitioner attempted to utilize the unilateral rescission clause in Rev. Rul. 80-58, supra: "A rescission may be effected * * * by one of the parties declaring a rescission of the contract

without the consent of the other if sufficient grounds exist".
Id. at 181-182.  As more fully set forth hereinafter, petitioner,
on December 28, 1989, through Merrill Lynch, "reacquired" 96,600
shares of WalMart stock.  Petitioners assert that their
"repurchase" of shares put them in all material respects in the
same position they occupied in January 1989.  They contend that
the "sufficient grounds" for rescission with Merrill Lynch are
either mutual mistake or conversion.

Petitioner attempted to bring himself within the first
situation described in Rev. Rul. 80-58, supra, to reflect a
rescission to the extent of 96,600 of the 100,000 shares sold on
January 3, 1989, by having Merrill Lynch purchase for him 96,600
shares of WalMart on December 28, 1989.  He wanted Merrill Lynch
to report to the IRS on Form 1099 a sale of only 3,400 shares for
1989.  However, the record indicates that Merrill Lynch was
advised by tax experts not to change Form 1099 to reflect a
rescission, and was warned by the tax experts that it "could be
subject to civil and possibly criminal sanctions by the IRS if it
did so."  Nevertheless, Merrill Lynch agreed to help petitioner
"repurchase" 96,600 shares in his attempt to claim the benefits
of Rev. Rul. 80-58, supra, but made no representation as to what
effect such "repurchase" might have.  In a letter to petitioner's
lawyer, Merrill Lynch's counsel stated that it "is merely
treating this as a customer who is purchasing shares in his
account."  However, because it would be assisting in the

transaction, Merrill Lynch agreed not to charge commissions, but required that petitioner deposit sufficient funds or stock "to immediately pay for the purchase of 96,600 shares." The record further indicates that petitioner accepted Merrill Lynch's offer, and, as previously stated above, deposited cash with Merrill Lynch prior to the December 28, 1989, purchase of 96,600 shares.

While petitioners focus on the misunderstanding between petitioner and Merrill Lynch on January 3, 1989, it is the sale of the 96,600 share portion of the 100,000 shares of WalMart stock that they are attempting to rescind. In this attempt, they have confused Merrill Lynch with the actual purchasers of the stock. Merrill Lynch was merely the seller's agent.

Rev. Rul. 80-58, supra, discusses the income tax consequences of a rescission between a buyer and a seller. For the rescission to be effective, both buyer and seller must be put back in their original positions. Rev. Rul. 80-58, supra, 1980-1 C.B. 181, 181. In their brief, petitioners address only the relationship between themselves and Merrill Lynch. However, the buyer and the seller in the instant case are the January 3 purchasers of the WalMart stock and the petitioners, respectively, not Merrill Lynch and petitioners. As noted above, Merrill Lynch acted merely as an agent.[3]

---

[3] There is not here involved any issue as to Merrill Lynch's liability as an agent. Accordingly, we need not address that subject here. However, even if petitioners could establish that Merrill Lynch was liable to petitioners, see Restatement,

Neither buyer nor seller was put back into "the relative positions that they would have occupied had no contract been made."  Id. at 181.  The parties (petitioners and the IRS) stipulated that the January 3 sales were made without condition. The buyers never relinquished to petitioner the stock purchased on January 3, 1989.  Although petitioner purchased 96,600 shares of WalMart stock in December 1989, he stipulated that those shares were not the same shares of stock sold on January 3, 1989. To facilitate the December 28 purchase, petitioner borrowed $1,350,000 from his father.  Petitioner did not owe any money to his father for stock purchases prior to the January 3 sale.

Even if the parties involved are petitioners and Merrill Lynch, as petitioners contend, the requirements of Rev. Rul. 80-58, supra, have still not been satisfied.  Before the end of 1989, petitioners submitted the rescission claim against Merrill Lynch to arbitration.  As an alternative to the unilateral rescission theory, petitioners allege that this claim was the equivalent of application to a court for a decree of rescission because the agreement between petitioners and Merrill Lynch contained an enforceable arbitration provision.

---

Agency 2 sec. 44 (1958) ("If an authorization is ambiguous because of facts of which the agent has no notice, he has authority to act in accordance with what he reasonably believes to be the intent of the principal although this is contrary to the principal's intent"), petitioners would be bound to the January 3 buyers by the apparent authority Merrill Lynch exercised on behalf of petitioners.  See 3 Am. Jur. 2d, Agency, secs. 71, 270 (1986).

In <u>Hope v. Commissioner</u>, 55 T.C. 1020 (1971), affd. 471 F.2d 738 (3d Cir. 1973), the taxpayer sold his stock for $20 a share, but later discovered that the stock at that time was trading for over $50 a share on the market. <u>Id.</u> at 1026. In the year of the sale, he filed a complaint for rescission against the agent and the purchasers of the optioned stock. <u>Id.</u> The following year, the parties settled the dispute. <u>Id.</u> at 1027. When his case came before the Tax Court, the taxpayer argued that "his complaint requesting a rescission of the sale postponed his obligation to return the income from the sale until the year in which the suit was settled." <u>Id.</u> at 1030. This Court disagreed, holding that since the taxpayer had unfettered discretion to use the funds when he received them, "the mere filing of the suit by the petitioner was not of itself sufficient to postpone the realization of gain on the completed sale." <u>Id.</u> at 1030-1031. The Court also held that settlement of the suit was not the same as rescission. <u>Id.</u>

Like the taxpayer in <u>Hope</u>, petitioners here had unhindered control over the funds they received from the January 3, 1989, sale. Although they brought proceedings for rescission, since both the funds and the decision to seek a rescission were wholly within their control, they have failed to demonstrate that a rescission occurred which would postpone realization of the gain. See <u>Hope v. Commissioner</u>, 471 F.2d 738, 742 (3d Cir. 1973). Moreover, the settlement of petitioners' proceedings, which

occurred in the year following the transaction, does not amount to a rescission.  Hope v. Commissioner, 55 T.C. at 1031.

Petitioners present other arguments explaining why they have sufficient grounds for a unilateral rescission under Rev. Rul. 80-58, 1980-1 C.B. 181.  In light of our conclusions above, that petitioners confused the buyers with the agent, that neither buyers nor seller were put back into their pre-sale positions, and that a settlement is not a rescission, we need not address these arguments.

## 2.  Involuntary Conversion

Section 1033(a) allows nonrecognition of gain "If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted".  Petitioners contend that the sale of the WalMart stock by Merrill Lynch constituted a "seizure", and thus there was an involuntary conversion under section 1033(a).  Petitioners look to Webster's Third International Dictionary (1966) and define seizure as "to take by force" or "to take hold of."  Because the sale by Merrill Lynch was unauthorized, they argue, the stock was "seized".

Petitioners equate Merrill Lynch's actions with common-law conversion.  Since a common-law conversion has occurred, they assert, they should be given the benefit of section 1033.  We think that petitioner's argument stretches the statute beyond permissible limits.  Petitioners' arguments to the contrary,

involuntary conversion pursuant to section 1033 is statutory, not defined by the common law.  Indeed, it has even been stated that "Congress clearly intended to extend the benefits of section 1033 and its predecessor only to public takings and casualty-like conversions, and the limitation of its benefits to involuntary conversions--i.e., those 'wholly beyond control of the one whose property has been taken'--reflects that intent."  Wheeler v. Commissioner, 58 T.C. 459, 463 (1972).

In addition to their common-law conversion argument, petitioners treat "seizure", defined by them as "to take by force," as equivalent to theft.  Petitioners seek to compare themselves to the taxpayer in Rev. Rul. 66-355, 1966-2 C.B. 302. There, the taxpayer's financial manager pledged shares of the taxpayer's stock to a bank, without the taxpayer's permission, to secure the manager's personal loan.  The bank subsequently sold the shares to liquidate the loan.  Id. at 302.  The ruling holds that the manager's actions amounted to theft for purposes of section 1033.  Once again, petitioners' situation is quite different.  Despite the settlement between Merrill Lynch and petitioners, Merrill Lynch has never agreed, and petitioners have not demonstrated, that Merrill Lynch was at fault civilly, much less criminally.  At most, there was only a mutual mistake of fact between petitioner and Merrill Lynch.  Petitioners have failed to establish that an involuntary conversion has occurred. Cf.  Hope v. Commissioner, 55 T.C. at 1033-1035.

Accordingly,

<u>Decision will be entered</u>

<u>for respondent.</u>