T.C. Memo. 1999-288


UNITED STATES TAX COURT


J. DAVID GOLUB, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26507-95.                    Filed August 30, 1999.


J. David Golub, pro se.

<u>Paul L. Darcy</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, <u>Judge</u>:  In a notice of deficiency dated September 20, 1995, respondent determined deficiencies, an addition to tax, and penalties with respect to petitioner's Federal income taxes as follows:

| Year | Deficiency | Penalties Sec. 6662(a) | Addition to Tax Sec. 6651(a)(1) |
|------|-----------|------------------------|----------------------------------|
| 1991 | $112,652 | $22,530 | $5,125 |
| 1992 | 1,746 | 349 | -0- |

Respondent subsequently conceded that petitioner is not liable for the addition to tax under section 6651(a)(1).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) Whether petitioner failed to report interest income, taxable dividends, and capital gains from the sale of securities on his 1991 Federal income tax return; (2) whether a State tax refund and credit to petitioner in 1991 are subject to Federal income tax; (3) whether petitioner properly claimed Schedule C deductions on his 1991 and 1992 Federal income tax returns; (4) whether petitioner is permitted to carry over net operating losses to compute his 1991 and 1992 Federal income tax liabilities; (5) whether alleged procedural errors by respondent affect petitioner's liability for the deficiencies and penalties at issue; (6) whether petitioner is liable for accuracy-related penalties under section 6662(a) for 1991 and 1992; and (7) whether petitioner is liable for a penalty under section 6673.

FINDINGS OF FACT

The parties filed a stipulation of facts with attached exhibits. The facts reflected therein are so found, and, by this reference, are incorporated herein. Petitioner is a certified public accountant. He resided in Staten Island, New York, when the petition herein was filed.

The University of Chicago Litigation

In 1981, petitioner began filing lawsuits against the University of Chicago, IBM Corp., Ernst & Whinney, and Weiner & Co. alleging employment discrimination. In each of the proceedings, the trial court ruled against petitioner, and the U.S. Court of Appeals for the Second Circuit affirmed.[1]

On June 5, 1989, the U.S. District Court for the Eastern District of New York ordered its Clerk not to accept future filings made by petitioner against the University of Chicago, IBM Corp., Ernst & Whinney, and Weiner & Co., unless a U.S.

---

[1] See Golub v. Ernst & Whinney, 779 F.2d 38 (2d Cir. 1985), cert. denied 476 U.S. 1178 (1986); Golub v. University of Chicago, 876 F.2d 890 (2d Cir. 1989), cert. denied sub nom. Golub v. IBM Corp., 495 U.S. 941 (1990); Golub v. IBM Corp., 888 F.2d 1376 (2d Cir. 1989), cert. denied 495 U.S. 941 (1990); Golub v. Ernst & Whinney, 891 F.2d 277 (2d Cir. 1989), cert. denied sub nom. Golub v. IBM Corp., 495 U.S. 941 (1990); Golub v. Ernst & Whinney, IBM Corp., University of Chicago, Weiner & Co., Docket No. 89-7460 (2d Cir. Nov. 2, 1989); Golub v. Weiner & Co., 896 F.2d 543 (2d Cir. 1990), cert. denied sub nom. Golub v. IBM Corp., 495 U.S. 941 (1990); Golub v. Ernst & Whinney; IBM Corp., University of Chicago, Weiner & Co., Docket Nos. 90-7180 and 90-7496 (2d Cir. Jan. 7, 1991).

magistrate first granted leave.  In response, petitioner filed
another lawsuit naming the same defendants in the U.S. District
Court for the Southern District of New York.  As a result of this
filing, the U.S. District Court for the Eastern District issued
an order enjoining petitioner from filing further lawsuits
against those defendants.  It also required petitioner to pay
costs in the form of defendants' legal fees.

On January 11, 1991, the U.S. Court of Appeals for the
Second Circuit affirmed the District Court's order and imposed
additional sanctions of $1,000 upon petitioner.  The Court of
Appeals determined that petitioner's suit against the University
of Chicago, IBM Corp., Ernst & Whinney, and Weiner & Co. totally
lacked merit.  The court observed:

> Golub persists in filing duplicative claims that have
> been conclusively found to be wholly lacking in merit.
> He is a serial litigator whose conduct can no longer be
> tolerated.  Although we are aware of his pro se status,
> we are convinced that measures must be taken to prevent
> Golub from continuing to file such vexatious litigation
> which unfairly burdens the parties he names as
> defendants and the courts.
>
> In addition to affirming the district court's
> award of attorney's fees, we believe that the
> imposition of sanctions is warranted to deter Golub
> from continuing his attempts to harass. * * *
>
> Accordingly, we conclude that the imposition of
> damages in the amount of one thousand dollars ($1,000)
> is appropriate.  Additionally, the Clerk of this Court
> is directed not to accept any future filings by Golub,
> except for filings seeking further review of our
> decision herein, until the sanctions awarded by the
> district court are satisfied in full.  This disposition

should serve as a clear and unambiguous message to
Golub that the courts are not to be used as vehicles
for harassment.

## The Kidder Peabody Litigation

By 1981, approximately the time he instituted the litigation discussed above, petitioner had opened a brokerage account with Kidder, Peabody & Co., Inc. (Kidder Peabody).  He also entered into an agreement with Kidder Peabody enabling him to deal in "put" and "call" options.  Kidder Peabody agreed to extend credit to petitioner, enabling him to trade on margin.  Pursuant to a "Customer's Agreement", petitioner agreed that Kidder Peabody could hold the assets in his account as security for all liabilities that petitioner owed to Kidder Peabody.  Under the agreement, Kidder Peabody had "the right at any time without notice to apply any cash or credits" in petitioner's account "to payment of any * * * debit balances or other obligations" of petitioner.

In 1986 or 1987, petitioner began to complain that Kidder Peabody had engaged in unauthorized trades in his account.  On March 20, 1987, George C. Cabell, vice president and associate general counsel of Kidder Peabody, wrote to petitioner and explained:

> What has occurred is that you have failed to respond to
> margin maintenance calls made in connection with
> positions in your account with the result that
> positions in the account had to be liquidated to
> satisfy the maintenance calls. * * *

The letter concluded:  "We do not feel that we can consent to act on your behalf in the future in connection with this account, and we respectfully request that you transfer your account to another firm."

In reply, petitioner made a handwritten notation on a copy of Mr. Cabell's letter to him, stating:  "Your statement of the facts of this case is <u>not</u> correct.  As a result, I believe it is necessary for us to meet to discuss the '<u>exact</u>' nature of my claims."  Petitioner then wrote the following letter to Mr. Cabell:

May 12, 1987

Dear Mr. Cabell:

Your failure to respond to my request for an appointment to reconcile the facts and issues with respect to my account will only tarnish your defense to support your position before any impartial tribunal. In essence your solution is to create a "FORCED" LIQUIDATION where I must sell out securities regardless of the market timing.  Also, by forcing me to transfer this account to another Wall Street House, you believe that you can sweep all of your past improprieties under the rug with supposedly no trace left for public scrutiny.  The Churning transactions effectuated by your salesmen are a matter of record.  CASE IN POINT: I have documented all short positions (PUT TRANSACTIONS) sold and written in my account on a trade date basis where the WALL STREET JOURNAL and NEW YORK TIMES FINANCIAL PAGES listed an S or R.  Obviously, in such a case the purchaser had to be KIDDER, PEABODY as principal.  Shortly, thereafter, I was put stock where the expiration period was greater than six months and there was a less than 10% decline in the security price from the trade date market price.

Who put the stock in my account and for what reason?  What other explanation?  Why is KIDDER,

PEABODY acting as an UNDISCLOSED PRINCIPAL?  In February, 1987, I called Paul Tierny and requested that I be permitted to sell COVERED CALL OPTIONS as a start to liquidating my account.  He refused.  Yet you have the * * * audacity to continue to charge me margin interest and at the same time create a situation where you tie my hands and force liquidation?  What securities laws do you follow as general counsel for KIDDER, PEABODY?  Do you wish to test my allegations in a court of law?  Don't you guys have enough garbage from the SIEGEL-BOESKY AFFAIR?

Once again I am requesting a meeting with you and whoever else at KIDDER, PEABODY has the authority to make the necessary adjustments to correct the wrongs. I can be reached at the number cited above.

RESPECTFULLY,

J.D. GOLUB

On May 19, 1987, Kidder Peabody's vice president, Paul T. Tierney, responded:

I am in receipt of your letter to George Cabell dated May 12, 1987.

Our position remains the same, as we stated at previous meetings.  In addition, we again ask you to give us the name of a broker to transfer your account to as you said you would months ago.

During 1987 and 1988, petitioner continued his complaints against Kidder Peabody, insisting that Kidder Peabody had ignored his order to close his account and that Kidder Peabody had instead taken it over for its own purposes.  He filed complaints against Kidder Peabody with the National Association of Securities Dealers, Inc. (NASD), the Chicago Board Options Exchange, and the Office of Attorney General of the State of New

York.  In a letter to the New York attorney general's office, petitioner stated:

> Kidder, Peabody & Co., by its own action breached our brokerage agreement and forced a liquidation.  I refused to transfer this account to any other broker.  In my letter of May 12, 1987, I told them that I desired to liquidate the account.  I requested this orally on several prior occasions. * * *

None of these agencies decided to take action against Kidder Peabody; the NASD specifically determined that it could not find that there had been a violation of its rules.

In 1989, petitioner commenced litigation against Kidder Peabody and some of its employees in the U.S. District Court for the Southern District of New York.  In 1990, the District Court ordered the parties to arbitrate their differences.  Petitioner sought review of this order in the U.S. Court of Appeals for the Second Circuit.  In January of 1991, the Court of Appeals dismissed the appeal because the arbitration order was not appealable.

In October 1991, petitioner sent a letter to the District Court seeking permission to file a motion for injunctive relief on the grounds that Kidder Peabody failed to liquidate his account.  Sheila Chervin, an attorney in the general counsel's office of Kidder Peabody, responded in a letter to the District Court dated October 24, 1991, with a copy to petitioner.  Ms. Chervin explained that Kidder Peabody had no letter on file from

petitioner authorizing the liquidation of his account. She stated that, if petitioner would provide a letter authorizing liquidation, Kidder Peabody would comply. Petitioner responded with a letter asking that Kidder Peabody send him a daily statement that set forth the net asset value of his account. The letter also announced petitioner's plans to seek reconsideration of, or an appeal from, the District Court's order. Petitioner also argued that he had demanded the liquidation of his brokerage account in August of 1987. Ms. Chervin of Kidder Peabody replied, on November 11, 1991, informing petitioner that the current price of the stock in his brokerage account was available in library copies of the Wall Street Journal. Her letter also took exception to certain factual representations that petitioner had made. She concluded:

> Moreover, I wish to note for the record that it has been more than two weeks since I put in writing, in the October 24, 1991 letter to Judge Haight, that you could get the proceeds of your account by merely delivering to me a letter of authorization for its liquidation. I reiterated the procedure for doing so on the telephone to you more than one week ago. In the interim, I have received your November 7, 1991 letter (delivered by hand), but no letter of authorization. Please be advised that you can sit on this matter for as long as you wish, but that Kidder, Peabody takes no responsibility for your present recalcitrance or for any recalcitrance you have exhibited in the past.

Petitioner replied with a letter arguing that he had sought liquidation of his account many times in the past. The letter concluded:

CONSIDER THIS LETTER TO BE THE FORMAL AUTHORIZATION YOU REQUEST. ALL PRIOR LETTERS ARE INCORPORATED BY REFERENCE. (YOUR STATEMENT ABOUT RESPONSIBILITY FOR ALLEGED PRESENT RECALCITRANCE IS <u>IRRELEVANT</u>). I REINSTATE MY DEMAND FOR THE IMMEDIATE RELEASE OF ALL SEIZED MONIES IN THE KIDDER, PEABODY & CO., INC. BROKERAGE ACCOUNT.

NOTHING IN THIS LETTER OF DEMAND IS TO BE CONSTRUED AS SETTLEMENT OF THIS LITIGATION IN ANY FORM, MANNER OR CONTEXT.

Ms. Chervin, on behalf of Kidder Peabody, responded on November 22, 1991:

I understand your letter to constitute authorization by you that your account at Kidder, Peabody & Co. Incorporated, that is, account number 10U 77727 193, be liquidated and that upon liquidation, the proceeds of the said account be delivered to you, mailed to the above address.

We have begun to process the liquidation.

Notwithstanding the District Court's order that he submit his claims against Kidder Peabody to arbitration, petitioner did not do so. He instead filed motions and interlocutory appeals attempting to overcome the order to arbitrate. On September 29, 1992, the District Court entered an order stating: "Because this action has been stayed pending that arbitration, plaintiff is enjoined during that pendency from any further filings in this Court."

On February 8, 1993, the District Court denied an attempt by petitioner to have the arbitration order certified and thus eligible for appeal. Petitioner apparently sought an appeal of

this denial, but the Court of Appeals dismissed his appeal for failure to pay docket fees.

Petitioner's Income From the Kidder Peabody Account

During 1991, petitioner's account earned $698.85 in interest income, $15,882.21 in dividends, and an additional $458.41 in proceeds from miscellaneous sales of securities. At the time of the liquidation, in December of 1991, the balance in petitioner's account reflected a minus $141,400.64. Kidder Peabody liquidated petitioner's account in November and December of 1991. The subsequent liquidation produced proceeds of $387,686.49. Kidder Peabody used some of the cash from the proceeds to pay off petitioner's negative account liability. It sent the remaining funds, in five checks totaling $246,976.40, to petitioner.[2]

On his Federal income tax return for 1991, petitioner failed to report the dividend income from his account with Kidder Peabody. On Schedule B of the return, where interest income from Kidder Peabody should have been reported, petitioner wrote in the word "LITIGATION". On Schedule D of his return, in the space for reporting long-term capital gains, petitioner wrote "NONE". On

_____

[2] This figure includes the net amount of interest income ($192.91) plus dividends received during December 1991 ($674.37) less accrued interest expense for that month ($176.73). The bulk of these payments came in the form of a check for $246,332.77, which petitioner deposited into his bank account on Dec. 6, 1991. A check for the December dividends in the amount of $565 was issued to petitioner in January 1992.

the parts of the schedule reserved for identifying the transactions, he wrote, "Kidder Peabody & Co. Acct -- Litigation -- Partial Payment -- Received Escrowed -- Interest Bearing Acct".

Petitioner's 1991 return contained a Schedule C for reporting profits or losses from business. On that form, petitioner identified his principal business as real estate appraisal and financing. He reported income of $790 (in the form of interest) and expenses of $28,522. The expenses included "other expenses" of $10,000 for "Telephone, Litigation-Reputation, Professional Dues, Library-Law Publications". Petitioner also claimed a net operating loss carryover deduction of $11,439.

The State Income Tax Refund

Records of New York State Department of Taxation and Finance indicate that, in 1990, petitioner paid $1,743.89 in State and local income taxes. In 1991, the State issued a refund to petitioner of $743.89 and credited the $1,000 balance of these taxes to petitioner's 1991 State and local income tax liabilities. These transactions were not reflected on petitioner's 1991 Federal income tax return.

## Schedule C Deductions and Net Operating Loss Carryovers

Pursuant to an extension of time, petitioner filed his 1992 Federal income tax return on October 15, 1993. Thereon he reported no salary or wage income. His Schedule C, however, reported business income of $317 as interest on a money market account. He also deducted $36,035 in business expenses, including $15,000 for "Telephone, Litigation Reputation, Professional Dues, Law Library, Software--Computer Publications". On his 1992 return petitioner also claimed a net operating loss carryover of $34,797.

## Proceedings Before This Court

The parties were notified that this case had been set for trial approximately 5 months before the trial date. In preparing for trial, respondent repeatedly wrote to petitioner, asking for records that would demonstrate his bases in the securities that had been held in the Kidder Peabody account and for records that would substantiate his deductions. Such records were not forthcoming. Nor did petitioner participate meaningfully in developing the case for trial. He delayed in meeting with respondent concerning the stipulation process and ultimately contributed efforts that were, at best, negligible. All evidentiary documents contained in the stipulation were obtained by respondent from either Kidder Peabody or the U.S. District Court for the Southern District of New York.

Approximately 1 week before the trial date, petitioner filed a motion for continuance,[3] asserting that respondent had failed to comply with the standing pretrial order. Respondent countered with a motion to dismiss for lack of prosecution. Three days before trial, petitioner filed a notice indicating that all the defendants in the University of Chicago litigation and in the Kidder Peabody litigation would be subject to subpoena in petitioner's case before this Court. The Court set a hearing to consider these motions.

At that hearing, the Court inquired of petitioner what the University of Chicago had to do with the case at issue. Petitioner responded:

> Because the University of Chicago conspired with two other employers to discharge me, and then after those discharges, I was originally hired by Kidder, Peabody as an employee and then was told, like, that I couldn't be an employee, and I should become an independent contractor with them.
>
> That was basically done because there was pending litigation against those other employers, past dischargers, and the University of Chicago, who had intentionally withheld the issuance of a degree at that point and conspired with those employers to terminate me.

---

[3] Rule 133 provides that a motion for continuance filed less than 30 days before the trial date "ordinarily will be deemed dilatory and will be denied unless the ground therefor arose during that period or there was good reason for not making the motion sooner."

This is all related.  There is no absolute, rational basis for holding a person's assets the way they [i.e., Kidder Peabody] did * * *

We denied both petitioner's motion for a continuance and respondent's motion to dismiss.

At trial on this matter, petitioner sought to subpoena Ms. Chervin, who had represented Kidder Peabody in the District Court proceedings that petitioner had instituted.  Ms. Chervin sought to quash the subpoena, asserting in an affidavit that petitioner had failed to provide the fees and mileage required by Rule 148, that she had no personal knowledge of the matters involved and, further, that petitioner's attempt to subpoena her was an apparent attempt to circumvent the District Court's order barring petitioner from further filings against Kidder Peabody.  We granted her motion to quash on the basis of petitioner's failure to tender witness fees and mileage.  Our ruling did not address the other grounds presented.

At the conclusion of trial, we ordered opening briefs to be filed in 75 days, with answering briefs to be filed 45 days later.

On the due date for opening briefs, petitioner submitted a document which requested, among other things, an interlocutory appeal and an extension of time to file briefs.  We granted petitioner an additional 6 weeks to file his opening brief but denied his motion for interlocutory appeal.  Petitioner failed to

file a brief, and instead, at the expiration of the extension period, filed a document requesting, inter alia, that the Court vacate several previous orders, stay all proceedings, and further extend the time for filing briefs.  In response, the Court issued an order denying all of petitioner's requests except the extension of time to file an opening brief, for which an additional 7 weeks was given.  In that order, however, we advised that petitioner would receive no further extensions of time for filing his opening brief.

On the final deadline for filing a brief, petitioner submitted two documents--one entitled "Notice of Interlocutory Appeal" and the other entitled "Motion to Stay All Tax Court Proceedings and Postpone Opening Brief".  The document entitled Notice of Interlocutory Appeal failed to identify a controlling question of law with respect to which there was a substantial ground for difference of opinion and for which an immediate appeal might materially advance the ultimate termination of the litigation herein, as required by Rule 193.  In response, we ordered that these two documents be filed, and denied both the motion for leave to file an interlocutory appeal and the motion to stay further Tax Court proceedings.  We also ordered that no further briefs in this case would be accepted and that the Court would decide the case on the record presently before it.

The Court's records indicate that, in all, petitioner submitted 18 separate posttrial motions. He also filed two supplements to one of the motions and a single supplement to another. His motions generally sought reconsideration of our previous orders or interlocutory review of those orders. We denied all of those motions, other than the two seeking extensions of time to file his brief.

OPINION

I.   Unreported Income From Brokerage Account in 1991

In an action challenging a determination of tax deficiency, a deficiency notice carries a presumption of correctness requiring the taxpayer to prove by a preponderance of evidence that the Commissioner's determination was erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[4]

A.   The Tortious Conversion Claim

For Federal income tax purposes, gain or loss from the sale or use of property is attributable to the owner of the property.

---

[4] In some instances, a failure by the Commissioner to show that the taxpayer received alleged unreported income may affect the burden of proof. Here, however, the evidence sufficiently connects petitioner to the receipt of the income at issue to preclude considerations affecting the burden of proof. Cf. sec. 6201(d), as added by the Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 602(a), 110 Stat. 1452, 1463 (1996); Schaffer v. Commissioner, 779 F.2d 849, 857-858 (2d Cir. 1985), affg. in part and remanding in part Mandina v. Commissioner, T.C. Memo. 1982-34.

See Commissioner v. Bollinger, 485 U.S. 340, 344 (1988); see also Helvering v. Horst, 311 U.S. 112, 116-117 (1940); Blair v. Commissioner, 300 U.S. 5, 12 (1937). Thus, if a corporation deals in property as agent for another party, then for tax purposes the other party, and not the corporate agent, is the owner. See Commissioner v. Bollinger, supra at 345.

The ordinary relationship of a stockbroker to a customer is that of an agent to a principal. See Galigher v. Jones, 129 U.S. 193 (1889); 12 Am. Jur. 2d, Brokers, sec. 148 (1997). Accordingly, a stockbroker is not taxable on the earnings, gains, or losses generated by transactions in securities it undertakes for its customer. Rather the customer, as owner of the securities involved in the transactions, is the taxable party. The stockbroker nevertheless is required under section 6045 to file a return setting forth the name and address of each customer and the gross proceeds of that customer, together with such other information as may be required by the Secretary. See sec. 6045(a); sec. 1.6045-1(b), Income Tax Regs.

The evidence in this case reveals a straightforward principal-agent arrangement. Petitioner, as the customer and principal, engaged Kidder Peabody as his broker and agent to deal on his behalf with securities he owned. Early in 1991, Kidder

Peabody credited petitioner with $698.85 in interest income,[5] $15,882.21 in dividends, and an additional $458.41 in capital gains from miscellaneous sales of securities.  In November of 1991, after some heated correspondence, petitioner authorized Kidder Peabody to liquidate the account.  Kidder Peabody did so and, as required by law, furnished the required return to the IRS, reporting the interest income, dividends, and other miscellaneous proceeds as well as the gross liquidation proceeds of $387,686.49 to petitioner.  Petitioner, as the owner of the securities, is taxable on the income earned by the securities and on the subsequent gain generated by their sale.

We reject petitioner's contention that Kidder Peabody engaged in a "tortious conversion" of his account by refusing his directions in 1987 to close the account.[6]  Petitioner argues that Kidder Peabody, having exercised control over his property, became the owner of that property and is taxable on the gains realized when it was sold.  He concludes that his receipt of the

[5] Respondent mistakenly determined that petitioner had unreported interest income in the amount of $643.  At trial, respondent noted this mistake, and it has not prejudiced petitioner, who is taxable on the full $698.85.

[6] Although petitioner has declined to file a brief, he has set forth his arguments in a document entitled "Tax Protest" which he attached to his petition herein and also introduced into evidence at trial.  He has set forth additional arguments in a trial memorandum and made still others at trial.

net sale proceeds was not the receipt of taxable income but rather "a partial restitution by tortfeasor".

Petitioner is in effect seeking to relitigate in this forum his claims that Kidder Peabody improperly handled his account. These are claims that the District Court ordered the parties to arbitrate, but petitioner has failed to comply with that order. Petitioner apparently is displeased with the results he obtained in District Court. Therefore, having made appeals, and otherwise sought reconsideration, of the District Court's order until enjoined from any further filings, petitioner now seeks to bring Kidder Peabody (as a "hostile witness") into this Court. Petitioner, however, has already had ample opportunity to demonstrate the alleged tortious conversion, but, because he refuses to obey the District Court's order, he has failed to do so.

In any event, the evidence before this Court flatly belies petitioner's contentions of tortious conversion. The written agreements between Kidder Peabody and petitioner reveal an agency relationship between a broker and its customer. Although disputes clearly arose, we have no reason to find that the agency relationship ended before November 14, 1991, when petitioner, after considerable prodding by Kidder Peabody, submitted an explicit authorization to liquidate his account.

Petitioner has not shown that Kidder Peabody exercised any unauthorized dominion and control over his account by refusing to terminate it earlier. Petitioner misrepresented the facts in a letter to the Office of the Attorney General of New York, when he stated: "In my letter of May 12, 1987, I told them [Kidder Peabody] that I desired to liquidate the account." In that letter, however, petitioner only complained that he had been placed in "a situation where you [Kidder Peabody] tie my hands and force liquidation". Petitioner did not indicate any intent to liquidate his account; instead he merely sought "a meeting with you and whoever else at KIDDER, PEABODY has the authority to make the necessary adjustments to correct the wrongs." Petitioner also alleges that he tried to terminate his account orally before 1991. He offers no substantiation for these claims, however, and we have no more reason to believe them than we believe his misrepresentations in the letter he sent to the attorney general of New York.

B. The Open Transaction Claim

Petitioner fares no better with his contention that he received the income at issue in an "open transaction" which, presumably because of his litigation against Kidder Peabody, is too indefinite to be the subject of taxation in 1991. In rare and exceptional circumstances, when the fair market value of property received by a stockholder in exchange for his stock

cannot be ascertained, the original transaction may be considered open and later payments treated as capital gains, as they would have been if received at the time of the liquidation.  See Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126.  In petitioner's case, however, the property he received was cash, determined on the basis of prices of publicly traded stock.  There is no reason to treat the sale of stock as an open transaction.  Moreover, petitioner received the sale proceeds from the stock under a claim of right and without restriction as to their disposition.  He himself chose to engage in litigation that, however improbably, might affect the results of the sale.  Under these circumstances, his receipt of income is a fortiori taxable in the year of receipt.  See sec. 451(a); Hope v. Commissioner, 471 F.2d 738, 742 (3d Cir. 1973), affg. 55 T.C. 1020 (1971).

C.  Income on Payment of Indebtedness

In general, a payment made in satisfaction of a person's debt is income to that person.  See Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929).  Thus the amounts Kidder Peabody retained to pay off petitioner's obligations were income to petitioner.  Here, Kidder Peabody retained $141,577.37 pursuant to its contractual right to offset petitioner's margin obligations.  These margin obligations were consistently reflected as a "net debit balance" in Kidder Peabody's statements

of petitioner's account.  Petitioner is taxable both on the $246,976.40 that he received and on the portion of the sale proceeds retained by Kidder Peabody.

Petitioner also had the burden of proving how much gain or loss he realized on the sale of stock owned by him; such proof requires that he establish his basis in the stock.  See sec. 1012; Hall v. Commissioner, 92 T.C. 1027, 1038 (1989); sec. 1.1012-1(c), Income Tax Regs.  Petitioner is a certified public accountant, and the record shows that he is aware that gain on the sale of stock represents the amount received over the basis.[7] See sec. 1001(a).

Despite repeated invitations by respondent and by the Court to prove his basis in the stock sold, petitioner has failed to do so.  He has left the Court with no choice but to hold him liable on all the proceeds from the sale of the stock.  See Rockwell v. Commissioner, 512 F.2d 882, 887 (9th Cir. 1975), affg. T.C. Memo. 1972-133.  Petitioner thus may end up paying more in capital

---

[7] Petitioner knew of the importance of establishing his basis in the securities sold.  In proceedings on his motion to continue, petitioner explained "if the Tax Court says that, Mr. Golub, we still believe that this is income to you * * * then that's a basis problem * * * then at best there's a basis computation problem * * * for me".  Additionally, petitioner's pretrial memorandum urges that Kidder Peabody, rather than he himself, was taxable on the sale proceeds.  In so stating, he contended that Kidder Peabody "SHALL BE MADE TO ANSWER AND PAY FOR THE TAX ON THE CONVERTED ASSETS, WHILE ASCRIBING A ZERO BASIS AS THE PENALTY FOR SUCH OUTRAGEOUS, MALICIOUS CONDUCT."

gains taxes than he would have if he had provided evidence of basis.  But if so, he has only himself to blame.

II.  <u>State Tax Refund Income</u>

Respondent has also determined that petitioner's 1991 taxable income includes the $1,743.89 that the State of New York refunded or credited to petitioner in that year as overpaid State taxes from the previous year.

Section 111(a) provides that income recovered during the taxable year is excluded from gross income for that year but only to the extent that the amount of the recovery did not reduce prior Federal income taxes.  The amount excluded is called the "recovery exclusion".  Accordingly, if a taxpayer would not have positive taxable income in a given year regardless of whether he or she deducted State income taxes for that year, then the taxpayer's recovery of those taxes in a subsequent year will be excluded from gross income in that subsequent year.  See sec. 1.111-1(b)(2), Income Tax Regs.

The evidence shows that, in 1991, the State sent $743.89 of previously overpaid income taxes directly to petitioner, and it credited the $1,000 balance of these overpaid taxes to petitioner's 1991 State income tax liabilities.  Petitioner

reported none of this refund on his Federal income tax return for 1991.[8]

In this case, petitioner's 1990 return indicates taxable income of a minus $13,489. Included in the amounts deducted for that year on Schedule C under "Taxes and licenses" was the amount of $1,099,[9] which petitioner labeled "State and local". It is obvious that the deduction of State income taxes produced no tax benefit to petitioner for 1990; he would have had a negative amount for taxable income in any event. Accordingly, under the regulations promulgated pursuant to section 111, the $1,743.89 in State taxes refunded to petitioner in 1991 constitute a "recovery exclusion" and need not be included in gross income for that year.[10]

---

[8] Under sec. 451, the full $1,743.89 would ordinarily be included in income. The $743.89 would be included because it was actually received by petitioner, and the $1,000 which he directed be credited against his 1991 State income tax liabilities would be included in his gross income as "constructively received" insofar as it is credited to petitioner's account, or set apart for him, or otherwise made available to him. Sec. 1.451-2(a), Income Tax Regs.

[9] Petitioner has not explained the apparent discrepancy between his 1990 deduction of $1,099 for "State and local" taxes and the return in 1991 of $1,743.89 of such taxes.

[10] The regulations under sec. 111 also provide that "the aggregate of the section 111 items [e.g., the State income taxes paid for a prior year] must be further decreased by the portion thereof which caused a reduction in tax in preceding or succeeding taxable years through any net operating loss carryovers or carrybacks * * * affected by such items." Sec.
(continued...)

III.  Schedule C Deductions

Income tax deductions are a matter of legislative grace, and the burden of clearly showing the right to the claimed deduction is on the taxpayer.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Moreover, deductions are strictly construed and allowed only "'as there is a clear provision therefor.'"  Id. (quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934)).  Taxpayers must substantiate any deductions claimed. See Hradesky v. Commissioner, 65 T.C. 87 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).  Section 6001 provides that a taxpayer must keep records that suffice to establish the amount of the claimed deductions.

Section 162(a) allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business.  In the instant case, petitioner claimed Schedule C deductions of $27,732 and $35,718, respectively, on his 1991 and 1992 Federal income tax returns. At trial, however, he failed to produce any records to support these deductions.  Moreover, his income tax returns give us ample

---

[10](...continued)
1.111-1(b)(2)(ii)(b), Income Tax Regs.  Under these regulations, the $1,753 recovery exclusion might have been reduced for 1991 if carryovers from 1989 and 1990 had been given effect.  However, we have sustained respondent's disallowance of such carryovers and thus they do not affect the amount of the recovery exclusion in this instance.

reason to be skeptical about the accuracy of the claimed deductions. For example, in 1991, the largest item deducted was a round figure of $10,000 as "other expenses" for "Telephone, Litigation-Reputation, Professional Dues, Library-Law Publications". For 1992, petitioner claimed, as "other expenses", $15,000 for "Telephone, Litigation Reputation, Professional Dues, Law Library, Software--Computer Publications". The size of these amounts when compared to the purposes for which they were allegedly spent causes us to doubt their accuracy. Having reviewed petitioner's pleadings in this and other cases, we cannot accept the assertion that he expended these amounts of money for the purposes set forth.

In any event, it was his obligation to demonstrate the facts establishing the amount and nature of deductible expenses, and he has failed to do so. While it is within the purview of this Court to estimate the amount of allowable deductions where there is evidence that deductible expenses were incurred, see Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), we must have some basis on which an estimate may be made, see Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Because the record contains no evidence upon which we might base such an estimate, we find that petitioner has failed to prove that he is entitled to claim any deductions under section 162(a). See Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

IV.  Net Operating Loss Carryovers

Section 172(a) authorizes a net operating loss deduction. In general, a net operating loss is the excess of a taxpayer's deductions over his gross income, with certain modifications. The modifications include eliminating from the computations the net operating loss deductions, capital gains and losses of taxpayers other than corporations, the deduction of personal exemptions, and nonbusiness deductions.  Section 172(b) permits a net operating loss to be carried back and applied against taxable income for the preceding 3 taxable years and the succeeding 15 years.  In the case of net operating loss deductions, as in the case of other deductions, the taxpayer bears the burden of proving the facts and the amount of the loss.  See Rule 142(a); Ocean Sands Holding Corp. v. Commissioner, T.C. Memo. 1980-423, affd. without published opinion 701 F.2d 167 (4th Cir. 1983).

On his 1991 Federal income tax return, petitioner claimed a net operating loss carryover of $11,439 from his 1989 and 1990 taxable years.  On his 1992 Federal income tax return, petitioner claimed a net operating loss carryover of $34,797 from his 1989, 1990, and 1991 taxable years.  Respondent's notice of deficiency disallowed these net operating loss carryovers.  In the substantive part of his petition, which petitioner denominated "Tax Protest Letter", he did not contest the disallowance of the net operating loss carryovers, nor did he otherwise address their

disallowance at trial or in his numerous filings.  We treat his failure to address these issues as, in effect, a concession.  See Rules 34(b)(4), 151(e)(4) and (5); <u>Sundstrand Corp. v. Commissioner</u>, 96 T.C. 226, 344 (1991); <u>Money v. Commissioner</u>, 89 T.C. 46, 48 (1987); <u>Grossman v. Commissioner</u>, T.C. Memo. 1996-452, supplemented by T.C. Memo. 1997-451, affd. ___ F.3d ___(4th Cir., June 28, 1999).

Even if petitioner had not conceded the net operating loss issue, he nevertheless failed to present evidence that would overcome respondent's determination to disallow the net operating loss carryovers.  Under these circumstances, we sustain respondent's determination and hold that petitioner is not entitled to deduct the net operating loss carryovers at issue. See <u>Head v. Commissioner</u>, T.C. Memo. 1997-270.

## V.  <u>Procedural Issues</u>

### A.  <u>Validity of Deficiency Notice</u>

Petitioner, relying upon <u>Portillo v. Commissioner</u>, 932 F.2d 1128 (5th Cir. 1991), affg. in part, revg. in part and remanding T.C. Memo. 1990-68, contends that respondent's notice of deficiency was "arbitrary, frivolous, and capricious" and thus that the determination that he received unreported income was fatally flawed.  We disagree.  In <u>Portillo</u>, the Commissioner issued a notice of deficiency in reliance upon a third party's Form 1099 filed with the Commissioner.  The U.S. Court of Appeals

for the Fifth Circuit held that the notice was arbitrary because it lacked any "ligaments of fact". The court noted that the notice of deficiency would have been sufficient to entitle the Commissioner to a presumption of correctness if the Commissioner had demonstrated unreported income through "some * * * means, such as by showing the taxpayer's * * * bank deposits". Id. at 1134.

Petitioner's situation is significantly different from that of the taxpayer in Portillo. Here petitioner concedes that he received the proceeds of the sale of his stock--although, in his pretrial memorandum, he calls those proceeds a "partial restitution". Petitioner's bank statement reflects a deposit of $246,332.77 in December 1991. Moreover, Kidder Peabody's records indicate that petitioner is chargeable with other income from dividends and prior sales of stock, including the income used to pay his contractual account obligations to Kidder Peabody. These are sufficient ligaments of fact to connect petitioner to the income at issue. We hold that the notice of deficiency issued to petitioner was valid.[11]

B. Pretrial Proceedings

Petitioner contends that respondent failed to comply with the pretrial order and prejudiced his case. Petitioner urges

---

[11] See supra note 4.

that we consider dismissal an appropriate sanction. The pretrial order stated:

> If any unexcused failure to comply with this Order adversely affects the timing or conduct of the trial, the Court may impose appropriate sanctions, including dismissal, to prevent prejudice to the other party or imposition on the Court. * * *

Before the trial of this case, we examined petitioner's complaints about pretrial proceedings in a lengthy hearing on his motion for continuance. There petitioner demonstrated that, 2 months before trial, he may have encountered some difficulty in determining which attorney would handle the case for respondent. This difficulty, however, did not prejudice his preparation of the case. Petitioner has also contended that his preparation was impaired by having to receive physical therapy twice a week before the trial of this matter. Again, we determined that he has shown no prejudice to his preparation of his case because of these treatments.

We reaffirm our conclusion to that effect.

C.  Quashing the Subpoena

Petitioner has also questioned the Court's granting of the motion to quash his subpoena issued to Ms. Chervin, counsel for Kidder Peabody in the District Court proceedings that petitioner instituted. Ms. Chervin sought to quash the subpoena, asserting in an affidavit that petitioner had failed to provide the fees and mileage required by Rule 148. She further averred that she

had no personal knowledge of the matters involved.  Finally, she contended that petitioner's attempt to subpoena her in this proceeding was an effort to circumvent the order of the U.S. District Court for the Eastern District barring petitioner from making further filings in his case against Kidder Peabody.  We granted the motion to quash because petitioner had failed to furnish fees and mileage.  We did not reach the other bases to quash asserted by Ms. Chervin.

Congress, in section 7453, has provided that proceedings before this Court are to be conducted according to such rules of practice and procedure as this Court shall prescribe.  This Court's Rule 148 provides as follows:

> (a) Amount:  Any witness summoned to a hearing or trial * * * shall receive the same fees and mileage as witnesses in the United States District Courts. * * *

> (b)  Tender:  No witness, other than one for the Commissioner, shall be required to testify until the witness shall have been tendered the fees and mileage to which the witness is entitled according to law. * * *

Petitioner did not follow our Rules.  He has given no reason for his failure to do so.  The record in this case indicates that petitioner is a person of ample means, and, further, that he is familiar with the Rules of this Court.  There was no impediment to his furnishing the fees and mileage prescribed in our Rules. In this instance, however, as in many others, he has failed to follow those Rules.  The Court is entitled to enforce its Rules.

We did so properly in this case when, in accordance with Rule 148(b), we did not require the witness to testify in the absence of a tender of fees and mileage. We decline to reconsider that action.

## VI. Accuracy-Related Penalties

We must also decide whether petitioner is liable for accuracy-related penalties for 1991 and 1992. Section 6662(a) imposes an accuracy-related penalty in the amount of 20 percent of the portion of an underpayment of tax attributable to negligence or disregard of rules or regulations. See sec. 6662(a) and (b)(1). Negligence is any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has been further defined as the failure to exercise due care or the failure to do what a reasonable and prudent person would do under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). Disregard includes any careless, reckless, or intentional disregard of rules or regulations. See sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. No penalty will be imposed with respect to any portion of any underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. See sec. 6664(c).

On the basis of this record, we conclude that petitioner is liable for accuracy-related penalties under section 6662(a). In 1991, he failed to report substantial amounts of income. In 1991 and 1992, he claimed deductions to which he was not entitled. He failed to provide any reasonable explanation or any credible evidence to substantiate his entitlement to the deductions. He has not shown that there was reasonable cause for any portion of the resulting underpayment, or that he acted in good faith. Petitioner's actions were not those of a reasonable and prudent person under the circumstances. Accordingly, petitioner is liable for accuracy-related penalties under section 6662(a) for 1991 and 1992.

VII. Penalty Under Section 6673

Respondent seeks imposition of a penalty under section 6673. Section 6673(a)(1) allows this Court to award a penalty not in excess of $25,000 when proceedings have been instituted or maintained primarily for delay, or where the taxpayer's position is frivolous or groundless or if it is contrary to established law and unsupported by a reasoned, colorable argument for a change in the law. See Coleman v. Commissioner, 791 F.2d 68, 71 (7th Cir. 1986); Kish v. Commissioner, T.C. Memo. 1998-16; Talmage v. Commissioner, T.C. Memo. 1996-114, affd. without published opinion 101 F.3d 695 (4th Cir. 1996). In our opinion,

such is the case here, and we believe that a penalty is appropriate.

Petitioner is a certified public accountant. From his appearances before us, we know that he is sufficiently conversant with tax law to understand the issues presented in this case. He knew of his obligation to present facts concerning his bases in his securities and the nature of his claimed business expenses. Nevertheless, for reasons of his own, he has chosen not to do so. Instead, he has advanced the baseless notion that his receipt of hundreds of thousands of dollars from liquidation of his account is not income, but rather a "a partial restitution by tortfeasor".

Petitioner's conduct of this case makes it plain that he has instituted this action in a renewed attempt to argue that Kidder Peabody, the University of Chicago, and others, named as defendants in his previous lawsuits, have wronged him. Two U.S. District Courts have forbidden petitioner from using their resources to attack these defendants, and the U.S. Court of Appeals for the Second Circuit has issued a similar order and levied sanctions against him. Petitioner has now sought to use this Court for the same ends, but he may not do so.

Our function is to provide a forum for deciding issues regarding liability for Federal taxes. Petitioner has interfered with that function, to the detriment of parties wishing to

present legitimate cases.  Petitioner has also caused needless expense and wasted resources for respondent, respondent's counsel, the proposed witness, and this Court.  We do not, and should not, countenance the use of this Court as a vehicle for a disgruntled litigant to proclaim the alleged wrongdoing of others, especially when that litigant has refused to obey an appropriate court's order to arbitrate his grievances.

In this case, petitioner received substantial amounts of income in 1991, but he failed to pay income taxes on those amounts.  His defense to that failure is frivolous and wholly without merit.  We will require petitioner to pay a $10,000 penalty under section 6673(a).

Petitioner has advanced many other arguments in his submissions to this Court.  They appear to be variations of the contentions we have addressed herein.  We have considered all those arguments, and, to the extent not specifically addressed herein, we find them to be without merit.

In view of the foregoing,

Decision will be entered under Rule 155.